# Supreme Court of Florida

_____

No. SC14-1054
_____

**THE FLORIDA BAR,**
Complainant,

vs.

**ROBERT D. ADAMS,**
Respondent.

_____

No. SC14-1056
_____

**THE FLORIDA BAR,**
Complainant,

vs.

**ADAM ROBERT FILTHAUT,**
Respondent.

[August 25, 2016]

PER CURIAM.

We have for review a referee's report recommending that Robert D. Adams

and Adam Robert Filthaut be found guilty of professional misconduct and

permanently disbarred. We have jurisdiction. See art. V, § 15, Fla. Const. As

more fully explained below, we approve the referee's factual findings, recommendations as to guilt, and recommendations as to discipline in their entirety.[1]

**FACTS**

The Respondents in these two cases, Adam Robert Filthaut and Robert D. Adams, were members of a law firm, Adams & Diaco, P.A., in Tampa, Florida. Stephen Christopher Diaco was also a member of this firm and also took part in the events that are the subject of these proceedings. As a result of disciplinary action against Diaco and the withdrawal of his petition seeking review of the referee's report, which jointly addressed Adams, Filthaut, and Diaco, Diaco has been permanently disbarred. See Fla. Bar v. Diaco, No. SC14-1052 (Fla. Jan 28, 2016).

The misconduct giving rise to the disciplinary actions against these three attorneys is among the most shocking, unethical, and unprofessional as has ever been brought before this Court. A brief summary of the facts, as found by the referee in his report, is as follows, and the full referee's report is attached to this opinion.[2] In January 2014, Adams & Diaco, P.A. was defending a radio network

---

1. The referee's report addressed both Adams and Filthaut, as well as a third respondent, Stephen Diaco. Diaco's case has been disposed of separately, and we have consolidated these remaining two cases.

2. The referee's very detailed and thorough report is incorporated herein as a part of this Court's opinion. We commend the referee, the Honorable William

and one of its disc jockeys, "Bubba the Love Sponge" Clem, in a civil suit. Opposing counsel included attorney Phillip Campbell, who represented another disc jockey named Todd Schnitt. Schnitt brought the action against Clem. The lawsuit was hotly contested for over five years and received substantial media coverage in the Tampa area. On the evening of January 23, 2013, while the trial was in recess for the night, Campbell and his cocounsel, Johnathan Ellis, walked to a nearby restaurant, Malio's Steakhouse, for dinner and a drink. Unbeknownst to Campbell, a paralegal who worked for Respondents happened to be at Malio's with a friend. Campbell did not know the paralegal, Melissa Personius, but she recognized Campbell as she was leaving the bar.

Personius contacted Adams after she left Malio's to inform him she had seen Campbell at the bar. Adams then notified Diaco and called Personius back. After this call from Adams, Personius returned to Malio's. Filthaut called his friend Sergeant Raymond Fernandez of the Tampa Police Department, informing him that Campbell was at Malio's drinking and might drive while intoxicated. Filthaut did not inform Fernandez that Campbell was opposing counsel in the Schnitt versus Clem litigation.

Douglas Baird, for his dedication and careful consideration of these three difficult attorney disciplinary cases.

Upon returning to Malio's, Personius and her friend took a seat next to Campbell at the bar. Personius told Campbell, Ellis, and another attorney present that she was a paralegal but lied about where she was employed. Personius openly and obviously flirted with Campbell, encouraged him to drink, and bought him drinks. All the while, without Campbell's knowledge, communications continued among Respondents, Personius, and Fernandez. Personius kept Respondents informed about what was transpiring with Campbell inside Malio's. Fernandez assigned another officer to stake out Malio's to see if Campbell would drive while intoxicated.

By 9:30 or 9:45 p.m., Personius' friend and the other attorneys with Campbell had left Malio's. Personius also had learned during the evening that Campbell had walked to Malio's and intended to walk home—he lived a few blocks away. Witnesses who observed Personius that evening testified that she appeared to be intoxicated. Campbell observed the same, and he offered to call her a cab. She told him her car was in valet parking. He offered to see if it could be kept overnight. She told him that she needed to get to her car. He took her valet ticket, had the car brought up, and confirmed with the valet that it could be left overnight. She then refused to leave her car and insisted that it needed to be moved to a secure public parking lot where she could have access to it. He tried to convince her to leave the car, but she insisted that it had to be moved. Out of

frustration, he agreed to move the car to a lot near his apartment building and call her a cab from there.

Shortly after leaving Malio's driving Personius' car, Campbell was pulled over by Fernandez and subsequently arrested for DUI and taken to jail. Additionally, Campbell inadvertently left his trial bag in Personius' car. Personius and her car were later driven to her home by an associate attorney in Respondents' firm.

The next day, Stephen Diaco made several statements to the media about the DUI of his opposing counsel Campbell, how the arrest caused the trial to be continued, and how Campbell's behavior was a mockery of the judicial system and an embarrassment to Diaco as an attorney. Additionally, the Respondents were in possession of Campbell's trial bag for several hours and made no attempt to inform him or return the bag until after Personius' identity was discovered and Campbell's cocounsel, Ellis, demanded return of the bag.

The referee's report recommended permanent disbarment for Diaco, Adams, and Filthaut. The report sets forth the extensive communications among the three Respondents, Personius, and Fernandez on the night at issue. The referee found that Respondents engaged in numerous acts of misconduct, including a previous attempt to have Campbell arrested for DUI by Filthaut and his friend Sergeant Fernandez.

Respondents Adams and Filthaut seek review of the referee's report and recommendations. Neither Adams nor Filthaut challenges the referee's factual findings. Filthaut challenges the referee's denial of a motion to disqualify, the denial of a motion for summary judgment, the referee's alleged reliance on facts not in evidence, and the referee's recommendation that he be found guilty of violating Rule Regulating the Florida Bar 3-4.3. Filthaut also challenges the referee's recommendation of permanent disbarment, arguing for the lesser sanction of a rehabilitative suspension up to disbarment. Adams challenges only the recommendation of permanent disbarment and advocates instead for disbarment. As discussed below, we approve the referee's recommendations in full.

## ANALYSIS

First, we reject without further discussion Filthaut's claim that the referee improperly failed to disqualify himself, as the grounds alleged were legally insufficient. Regarding his claim that the referee improperly relied upon facts not in evidence, we also reject this claim as meritless.

As to Filthaut's claim that a partial summary judgment should have been granted in his favor on various rule violations, this is also without merit. The complaint and evidence produced at the final hearing clearly showed that Filthaut actively participated with Adams and Diaco in a scheme to improperly cause the arrest of opposing counsel during the midst of an ongoing high-profile civil trial.

The arrest was designed to and had the effect of disrupting the proceedings, including a postponement of the witness testimony and the necessity of juror interviews regarding the publicity surrounding the arrest. Thus, this claim is without merit.

Tied to Filthaut's argument pertaining to the denial of summary judgment is his argument that he should not have been found guilty of violating rule 3-4.3. Rule 3-4.3 provides, in pertinent part, that the "commission by a lawyer of any act that is unlawful or contrary to honesty and justice . . . may constitute a cause for discipline." Filthaut appears to argue that the referee's recommendation that he be found guilty of violating this rule should be disapproved because there was no direct evidence that he destroyed or consented to the destruction of the cell phone that he used during the events at issue in this case. This argument is meritless, and ignores the referee's detailed findings that Filthaut violated rule 3-4.3 by actively conspiring with Diaco, Adams, Personius, and Fernandez to improperly effect Campbell's DUI arrest. In addition, the referee found that Filthaut specifically refused to respond to questions confirming that he had erased, secreted, or otherwise destroyed cell phone communications that would constitute direct evidence of the nature of his communications that night. The referee "indulged all the adverse inferences that may permissibly be imposed as a result." Filthaut does not dispute that the referee appropriately indulged such adverse inferences, and he

provides insufficient support for his argument that such cannot serve as a basis for the referee's findings that he too erased or destroyed the cell phone communications that would have further implicated him in the scheme to have Campbell arrested. Accordingly, we approve the referee's recommendation that Filthaut be found guilty of violating rule 3-4.3.

As for Adams' and Filthaut's challenges to the referee's recommendation that they be permanently disbarred, the standard of review for a referee's recommendation as to discipline is as follows:

> In reviewing a referee's recommended discipline, this Court's scope of review is broader than that afforded to the referee's findings of fact because, ultimately, it is the Court's responsibility to order the appropriate sanction. See Fla. Bar v. Anderson, 538 So. 2d 852, 854 (Fla. 1989); see also art. V, §15, Fla. Const. However, generally speaking, this Court will not second-guess the referee's recommended discipline as long as it has a reasonable basis in existing caselaw and the [Florida] Standards for Imposing Lawyer Sanctions. See Fla. Bar v. Temmer, 753 So. 2d 555, 558 (Fla. 1999).

Fla. Bar v. Ratiner, 46 So. 3d 35, 39 (Fla. 2010).

Neither Filthaut nor Adams seriously contests the referee's recommendation that they be disbarred, and their co-respondent, Stephen Diaco, has already agreed to and been permanently disbarred. Filthaut and Adams simply contend that their misconduct is not so severe as to warrant permanent disbarment. The most persuasive argument in Respondents' favor is that in imposing permanent disbarment, this Court has usually addressed patterns of continuing egregious and

unrepentant misconduct demonstrating that the respondent attorney is not amenable to rehabilitation and is beyond redemption. For example, in <u>Florida Bar v. Norkin</u>, 183 So. 3d 1018, 1023 (Fla. 2015), the Court permanently disbarred an attorney who had been previously suspended from the practice of law for two years for relentless unprofessional behavior towards judges and opposing counsel and who had been ordered to appear before the Court for a public reprimand.[3] Following his suspension, Norkin failed to fully comply with the suspension order, continued to engage in the practice of law, sent unprofessional and threatening e-mails to Bar counsel, and during the public reprimand administered by the Court "intentionally smirked and stared down each Justice one by one." <u>Id.</u> The Court addressed Norkin's discipline as follows:

> Moreover, given Norkin's continuation of his egregious behavior following his suspension and during the administration of the public reprimand, we conclude that he will not change his pattern of misconduct. Indeed, his filings in the instant case continue to demonstrate his disregard for this Court, his unrepentant attitude, and his intent to continue his defiant and contemptuous conduct that is demeaning to this Court, the Court's processes, and the profession of attorneys as a whole. Such misconduct cannot and will not be

---

3. In the previous disciplinary case, the Court found that despite repeated warnings from judges, Norkin continually engaged in rude, antagonistic, and extremely unprofessional behavior, including making false accusations against a senior judge, disrupting multiple court proceedings by yelling at judges and exhibiting disrespectful conduct, and relentless, unethical, and denigrating behavior toward opposing counsel. <u>Fla. Bar v. Norkin</u>, 132 So. 3d 77, 89-92 (Fla. 2013). Norkin also had previously been publicly reprimanded and required to attend ethics school for similar misbehavior. <u>Id.</u> at 91.

tolerated as it sullies the dignity of judicial proceedings and debases the constitutional republic we serve. We conclude that Norkin is not amenable to rehabilitation, and as argued by the Bar, is deserving of permanent disbarment.

Id. Similarly, in Florida Bar v. Behm, 41 So. 3d 136 (Fla. 2010), the Court permanently disbarred an attorney who was guilty of trust account violations and knowing failure to file or pay federal income taxes for the entire time he was admitted to practice law. The attorney had previously been publicly reprimanded as a result of misconduct in connection with a probate matter and had been previously suspended for ninety-one days for misconduct in a guardianship matter "that raised serious issues concerning his fitness to practice law." Id. at 151. In addition, at oral argument before this Court he declared his intention "to persist in refusing to file income tax returns '[u]nless the law changes or unless someone can show [him] a law that makes [him] clearly liable for income tax, for federal income tax.' " Id. The Court concluded that the "only appropriate sanction under these circumstances—cumulative misconduct and a persistent course of unrepentant misconduct—is permanent disbarment from the practice of law." Id.

Here, as to both Adams and Filthaut, the referee found as mitigating factors the absence of a prior disciplinary record and good character and reputation. Both have enjoyed relatively lengthy unblemished careers—Adams had been a member of the Florida Bar for approximately 17 years and Filthaut had been a member approximately 13 years at the time the misconduct occurred. And, both were able

- 10 -

to present multiple character witnesses on their behalf. On the other hand, in recommending permanent disbarment, the referee made factual findings linking Adams to a prior incident of unethical behavior involving paralegals for his firm surreptitiously photographing the office of a chiropractor who was a plaintiff in a case in which Adams was counsel for the defendant, and Filthaut had orchestrated (and Adams knew about) a prior attempt to have Campbell arrested.

On balance, we conclude that if the misconduct involved in this case is not comparable to that committed in the cases above, this is in part because the misconduct in this case is unique and essentially unprecedented, at least as documented in this Court's prior case law. The Respondents' actions constituted a deliberate and malicious effort to place a heavy finger on the scales of justice for the sole benefit of themselves and their client. The personal and professional harm inflicted upon Campbell (a fellow attorney) and his clients' case, upon Sergeant Fernandez (a personal friend of Filthaut and officer of the law), and upon the legal system, the legal profession, and the public's confidence in both, was simply collateral damage from the Respondents' point of view. The Respondents' willingness to inflict and indifference to causing such harm is, in the words of the referee, quite "stunning." The referee did not find remorse as a mitigating factor for either Respondent, and neither of them challenges this.

Given all of these circumstances, we conclude that the referee's recommendation of permanent disbarment is warranted and appropriately serves the three-pronged purpose of attorney discipline: (1) it is fair to society; (2) it is fair to the Respondents; and (3) it is severe enough to deter other attorneys from similar misconduct. See Fla. Bar v. Lawless, 640 So. 2d 1098, 1100 (Fla. 1994). We can only hope that our unanimous decision to approve the referee's recommendation to permanently disbar these attorneys, a sanction not contested by and already imposed upon the third attorney involved, Stephen Diaco, will serve to warn other attorneys of the high standards of professional conduct we demand of all attorneys. And we hope in some small way, it will send a message to the public that this Court will not tolerate such outrageous misconduct on the part of attorneys admitted to practice law in Florida.

## CONCLUSION

Accordingly, Robert D. Adams and Adam Robert Filthaut are hereby permanently disbarred from the practice of law in the State of Florida. Because the Respondents are currently suspended, the permanent disbarment is effective immediately. Respondents shall fully comply with Rule Regulating the Florida Bar 3-5.1(g).

Judgment is entered for The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida 32399-2300, for recovery of costs from Robert D. Adams in

the amount of $14,558.66, and from Adam Robert Filthaut in the amount of

$14,178.28, for which sum let execution issue.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, POLSTON, and PERRY, JJ., concur.

THE FILING OF A MOTION FOR REHEARING SHALL NOT ALTER THE EFFECTIVE DATE OF THIS DISBARMENT.

Original Proceeding – The Florida Bar

John F. Harkness, Jr., Executive Director, Tallahassee, Florida; Jodi Anderson Thompson and Katrina S. Brown, Bar Counsel, Tampa, Florida; and Adria E. Quintela, Staff Counsel, Sunrise, Florida,

for Complainant The Florida Bar

William Frederic Jung of Jung & Sisco, P.A., Tampa, Florida,

for Respondent Robert D. Adams

Mark Jon O'Brien, Tampa, Florida,

for Respondent Adam Robert Filthaut

## IN THE SUPREME COURT OF FLORIDA
(Before a Referee)

FILED
JOHN A. TOMASINO
AUG 27 2015
CLERK, SUPREME COURT
BY

THE FLORIDA BAR,

    Complainant,

v.

STEPHEN CHRISTOPHER DIACO,

    Respondent.

_____/

THE FLORIDA BAR,

    Complainant,

ROBERT D. ADAMS,

    Respondent.

_____/

THE FLORIDA BAR,

    Complainant,

v.

ADAM ROBERT FILTHAUT,

    Respondent.

_____/

Supreme Court Case
No. SC14-1052

The Florida Bar File
No. 2013-10,735 (13F)

Supreme Court Case
No. SC14-1054

The Florida Bar File
No. 2013-10,736 (13F)

Supreme Court Case
No. SC14-1056

The Florida Bar File
No. 2013-10,737 (13F)

## REPORT OF THE REFEREE

- 14 -

# I. SUMMARY OF PROCEEDINGS

Pursuant to the undersigned being duly appointed as Referee to conduct disciplinary proceedings herein according to Rule 3-7.6, Rules of Discipline, the following proceedings occurred:

On June 2, 2014, The Florida Bar filed separate Complaints against the Respondents, Stephen Christopher Diaco, Esq. ("DIACO"), Robert D. Adams, Esq. ("ADAMS"), and Adam Robert Filthaut, Esq. ("FILTHAUT"). On June 4, 2014, Amended Complaints were filed against Respondents ADAMS and FILTHAUT. The Honorable W. Douglas Baird was appointed as Referee in each matter pursuant to the Supreme Court of Florida's June 4, 2014 Order and the June 10, 2014 Order of the Honorable J. Thomas McGrady, Chief Judge of the Sixth Judicial Circuit. Because the cases against the Respondents arise out of the same facts, the cases were consolidated for the purpose of discovery on July 28, 2014, and subsequently consolidated for trial. Prior to trial, the Respondents filed motions for partial summary judgment, which were denied on May 11, 2015. The trial was bifurcated, with the guilt phase conducted between May 11, 2015, and May 21, 2015, and the sanctions phase conducted on August 6-7, 2015.

During the course of these proceedings, Respondent DIACO was represented by Gregory W. Kehoe, Esq., Danielle Kemp, Esq., and Joseph A. Corsmeier, Esq. Respondent ADAMS was represented by William F. Jung, Esq.

2

and Respondent FILTHAUT was represented by Mark J. O'Brien, Esq. The Florida Bar was represented by Jodi A. Thompson, Esq., Sheila Tuma, Esq., and Katrina Brown, Esq. All items properly filed, including pleadings, transcripts, exhibits, and this Report, constitute the record in this case and are being forwarded to the Supreme Court of Florida.

## II.  FINDINGS OF FACT: TFB No. 2013-10,735 (13F); No. 2013-10,736 (13F); No. 2013-10,737 (13F)

### A. Jurisdictional Statement

Respondents are, and at all times mentioned during this Investigation were, members of The Florida Bar subject to the jurisdiction and Disciplinary Rules of the Supreme Court.

### B. Narrative Summary – all cases

#### Narrative Summary Introduction

This matter involves three members of The Florida Bar who the Referee finds, individually and through a conspiracy among themselves and others, violated the Standards of Conduct and Rules of Professional Conduct of the Rules Regulating Members of The Florida Bar. The Referee believes that in order to more easily explain the factual circumstances that were proven by clear and convincing evidence at trial, a comprehensive narrative of each of the key findings will provide a more comprehensible format. Preceding that narrative, the major participants in the events that resulted in these proceedings are identified.

3

**Respondent DIACO** is an equity partner in the law firm of Adams & Diaco, P.A., whose offices are located in the Bank of America Building in downtown Tampa, Florida. He is the brother of Joseph A. Diaco, Jr., Esq., who is also an equity partner in Adams & Diaco, P.A. Throughout this proceeding, Respondent DIACO has refused to testify, either in deposition or at trial, based on his right against self-incrimination.

**Respondent ADAMS** is the third equity partner in Adams & Diaco, P.A., along with the Diacos. Throughout this proceeding, Respondent ADAMS refused to answer any questions in deposition, based on his right against self-incrimination. On the morning of trial, with all discovery completed and disclosed by The Florida Bar, he chose to testify.

**Respondent FILTHAUT** is a non-equity partner (also referred to as an "associate") in Adams & Diaco, P.A. Throughout this proceeding, Respondent FILTHAUT has refused to testify, either in deposition or at trial, based on his right against self-incrimination.

**Melissa Personius** is, and at all times pertinent to this matter was, a paralegal employed by Adams & Diaco, P.A. She worked primarily for Respondent ADAMS, but was subject to the direction or authority of all the partners, be they equity or non-equity. At the time of the material events, Ms. Personius lived in Brandon, a Tampa suburb, with Kristopher Personius, her ex-husband. Ms.

4

Personius refused to testify at trial based on her right against self-incrimination. She gave some testimony to the Pinellas County State Attorney's Office investigators and signed a short affidavit prior to these proceedings being brought, but she claimed to have no recollection of many significant portions of the events.

**Sergeant Raymond Fernandez** was, at all times material to these proceedings, a Sergeant with the City of Tampa, Florida Police Department. He had been with the Department for over 18 years, of which he spent the last 15 years on the Traffic Enforcement Unit. At the time of these events, he was the commander of the Traffic Enforcement Unit, otherwise known as the DUI Squad. Sergeant Fernandez was a close personal friend of Respondent FILTHAUT. Sergeant Fernandez refused to testify at trial based on his right against self-incrimination. Before these proceedings, however, he provided deposition testimony to investigators from the Pinellas County State Attorney's Office and testified at various administrative hearings regarding both the arrest of C. Philip Campbell, Jr., Esq., and his discharge from the Tampa Police Department.

**Brian Motroni, Esq.,** was an associate attorney with the firm of Adams & Diaco, P.A. at all times material to this matter. Mr. Motroni provided some information when he spoke with an investigating attorney for the Thirteenth Judicial Circuit Grievance Committee. At trial, Mr. Motroni refused to testify based upon his right against self-incrimination.

5

**Charles Philip Campbell, Jr., Esq.,** is a partner in the law firm of Shumaker, Loop, & Kendrick whose offices are also in the Bank of America Building in downtown Tampa. At the time of all relevant events, Mr. Campbell was lead counsel in the *Schnitt v. Clem* trial before Thirteenth Circuit Judge James D. Arnold, a high profile case between two radio "shock jock" personalities. Mr. Campbell represented Todd and Michele Schnitt while Adams & Diaco represented "Bubba the Love Sponge" Clem and Bubba Radio Network. Mr. Campbell testified at trial and the Referee found him to be a credible witness.

**Jonathan J. Ellis, Esq.,** is also a partner in Shumaker, Loop, & Kendrick, and, at all times material to this matter, co-counsel with Mr. Campbell in the *Schnitt v. Clem* litigation.

## I.

**Respondents DIACO, ADAMS, and FILTHAUT, members of Adams & Diaco, PA, conspired among themselves and with others to deliberately and maliciously effect the arrest of Mr. Campbell, an opposing attorney.**

THURSDAY, NOVEMBER 29, 2012 – FIRST ATTEMPTED ARREST

The major events that comprise this narrative occurred between the evening of January 23, 2013, and the afternoon of January 25, 2013. An earlier event, however, puts them in perspective and reveals a pattern of intentional conduct that resulted in these proceedings. The first effort to manipulate the arrest of Mr. Campbell by members of the Adams & Diaco law firm began approximately 60

6

days prior to January 23, 2013, and were revealed in a deposition of Sergeant Fernandez that was taken prior to the filing of these proceedings.

On the evening of November 29, 2012, Respondent FILTHAUT called his close friend Sergeant Fernandez and said: *"There's this guy that works in my building. He's an attorney. He gets drunk all the time. He goes to Malio's and drinks it up and then he drives home drunk."* Sergeant Fernandez was given the name *"Philip Campbell."* Respondent FILTHAUT did not tell Sergeant Fernandez that Mr. Campbell was the lead opposing attorney in a five-year-old high-profile civil action being defended by Adams & Diaco.

Sergeant Fernandez, based upon the information provided by Respondent FILTHAUT, ordered Officer Michael Lyon of the Tampa Police Department DUI Squad to stakeout Malio's Steakhouse in downtown Tampa, with specific instructions to look for Mr. Campbell. Officer Lyon was given Mr. Campbell's name and a vehicle description. Mr. Campbell was not observed driving that night and no arrest was made. After 45 minutes, the surveillance was discontinued. A compilation of recorded and preserved Tampa Police Mobile Data Terminal ("MDT") text communications between the officers of the DUI Squad on the evening of November 29, 2012, further confirms the effort to look for Mr. Campbell.

7

Respondent ADAMS admitted during trial that he learned of the November attempt to target Mr. Campbell shortly after it occurred. There was no evidence that he admonished Respondent FILTHAUT for those actions or made any effort to prohibit similar acts in the future.

## WEDNESDAY, JANUARY 23, 2013 – THE SETUP AND ARREST

The evening's events played out over a five or six hour period beginning around 5:00 p.m. on January 23, 2013. Following a day in the *Schnitt v. Clem* trial, Mr. Campbell walked from his office to Malio's Steakhouse in downtown Tampa to meet his trial partner, Mr. Ellis, for dinner and drinks.

Ms. Personius had also decided to go to Malio's for drinks after work with her friend Vanessa Fykes. They arrived at Malio's around 5:00 p.m. and had a glass of wine. After a short while, they decided to drive to the Fly Bar, a few blocks away. As they were leaving Malio's, Ms. Personius noticed that Mr. Campbell was at the bar. When Ms. Personius arrived at the Fly Bar, she contacted Respondent ADAMS and informed him that Mr. Campbell was at Malio's. Respondent ADAMS, after notifying Respondent DIACO of the information received from Ms. Personius, called her back. Following the call from Respondent ADAMS, Ms. Personius returned to Malio's.

Although she refused to testify at trial, Ms. Personius previously admitted during the State Attorney's investigation: *"I offered—I believe I offered to just go*

8

*back if they needed, you know, anything, any other–to see maybe if he's still there. I don't know. Whatever information the police or authorities needed."* She also admitted knowing that *"[t]he Police have a contact."* Sergeant Fernandez, in earlier sworn testimony, admitted that the "contact" that night was his close friend, Respondent FILTHAUT.

While Ms. Personius was returning to Malio's, Respondent ADAMS, after discussions with Respondent DIACO, called Respondent FILTHAUT to alert him that Mr. Campbell was at Malio's. As he had done two months earlier, Respondent FILTHAUT called Sergeant Fernandez to again encourage him to stakeout Malio's with the intent of arresting Mr. Campbell for Driving under the Influence. Sergeant Fernandez testified that he asked Respondent FILTHAUT, *"Is that the guy you called me about before?"* Respondent FILTHAUT acknowledged that it was and told Sergeant Fernandez, *"Hey, the attorney that's in my building, he's out drinking again at night at Malio's."* He also told Sergeant Fernandez, *"He's going to drive home again tonight drunk."* Sergeant Fernandez told Respondent FILTHAUT, *"Well, we didn't get him last time. We'll sit on him again and see what he does."* Respondent FILTHAUT again failed to tell Sergeant Fernandez that Mr. Campbell was the opposing attorney in the much-publicized and ongoing *Schnitt v. Clem* trial.

Sergeant Fernandez assigned a member of his DUI Squad, Officer Joseph Sustek, to sit outside of Malio's and look for Mr. Campbell's black BMW. Shortly after 8:00 p.m. that night, Sergeant Fernandez and another member of the DUI Squad, Officer Tim McGinnis, took up the surveillance and relieved Officer Sustek. During the evening, Sergeant Fernandez received periodic updates about what Mr. Campbell was doing inside Malio's by text or voice call from Respondent FILTHAUT.

While Sergeant Fernandez was setting up his surveillance for Mr. Campbell, Ms. Personius and Ms. Fykes had returned to Malio's. Ms. Personius took a seat at the bar next to Mr. Campbell. From about 7:00 p.m. until about 9:45 p.m., she engaged in conversation with Mr. Campbell, Mr. Ellis, and attorney Michael Trentalange. She told them that she was a paralegal working for Nathan Carney, Esq., at the firm of Trenam Kemker. She openly and obviously flirted with Mr. Campbell, encouraged him to drink, and bought him drinks herself.

While the drinking and conversation were occurring that night, Ms. Personius managed to carry on a steady series of cell phone texts and calls with each of the Respondents. For example, between 6:30 p.m. and 9:30 p.m. that night Ms. Personius either sent or received approximately 19 separate communications with Respondent FILTHAUT. During that same period, she had approximately 17 communications with Respondent ADAMS, and approximately 11 with

10

Respondent DIACO. In the half hour between 9:30 p.m. and 10:00 p.m., the approximate time Sergeant Fernandez pulled Mr. Campbell and Ms. Personius over after they left Malio's, Ms. Personius had approximately another 12 communications with Respondent FILTHAUT, 7 with Respondent ADAMS, and 2 with Respondent DIACO. The Florida Bar's Exhibit 59 provides a minute-by-minute chart of the dozens of cell phone communications that were occurring between the Respondents and Ms. Personius, as well as those among the Respondents themselves. The actual substance of those text messages is not known. If the Respondents' phones still exist, they chose not to produce them. Ms. Personius disposed of her phone before these proceedings began, and Sergeant Fernandez previously testified that all his texts were erased when he put some new software on his phone. It was obvious, however, from the recorded and preserved Tampa Police MDT text messages between patrol vehicles that night that Ms. Personius was providing Respondent FILTHAUT with regular updates. He passed on those updates to Sergeant Fernandez, who in turn, communicated them to Officers Sustek and McGinnis. At one point, Officer Sustek sent a MDT text to Sergeant Fernandez asking if he was going to be informed when Mr. Campbell left Malio's. Sergeant Fernandez replied that he was. That exchange was around 8:17 p.m., long before Mr. Campbell had left. It confirmed not only that Sergeant

11

Fernandez was being updated, but also that whoever was doing the updating intended to remain at Malio's until Mr. Campbell decided to leave.

By 9:30 p.m. to 9:45 p.m., Ms. Fykes and Mr. Ellis had left Malio's. Mr. Trentalange was leaving to make a 9:45 p.m. dinner reservation. During the evening, Ms. Personius learned that Mr. Campbell had walked to Malio's, did not have a car there, and that he intended to also walk the few blocks home. That was not out of the ordinary for Mr. Campbell, as was confirmed by the testimony of bartender Denise DiPietro, restaurant manager Dina Kuchkuda, Mr. Ellis, and attorney Michael Trentalange, all of whom the Referee found credible. In fact, Mr. Trentalange had a specific conversation with Mr. Campbell that night about his plans for the evening. Mr. Campbell told Mr. Trentalange that he planned to go home and be in bed around 10:00 p.m. and get up at 2:00 a.m. to work on the next day's witness testimony for the ongoing jury trial, then in its second week. Mr. Trentalange had known Mr. Campbell professionally for a number of years and testified that this was a routine Mr. Campbell regularly followed during jury trials.

Some of the witnesses who observed Ms. Personius that evening testified that she appeared to be intoxicated. That was certainly the opinion of Ms. Fykes, who, before leaving, told her not to drive and to call a cab. Mr. Campbell also felt that she was intoxicated and, as they were leaving, offered to call her a cab. She told him that her car was in valet parking. Mr. Campbell said he would see if it

could be kept overnight in the parking garage. Ms. Personius then told Mr. Campbell that she needed to get to her car. Mr. Campbell took her valet ticket to the attendant and had the car brought up. Mr. Campbell confirmed with the attendant that the car could be left overnight.

At that point, Ms. Personius refused to leave her car and insisted that it needed to be in a secure public parking lot where she could have access to it. Mr. Campbell tried to convince her to leave the car, but she maintained that it had to be moved[1]. Out of frustration, Mr. Campbell agreed to move the car to a lot near his apartment building and to call her a cab from there. Mr. Campbell fully admitted that she never asked him directly to drive her car. He chose instead to run the risk of a two-minute drive as a favor to someone who appeared too impaired to drive safely. Mr. Campbell was unaware that the self-professed paralegal from Trenam Kemker was feigning being stranded and, at that point and throughout the evening, was plotting with the Respondents to have him arrested.

The video of the parking lot area, which Mr. Campbell narrated during his testimony, shows that these events occurred between approximately 9:40 p.m. and 9:57 p.m. The timing is noteworthy. Cell phone call and text records show that at

---

[1] In reality, Ms. Personius was easily able to get herself and her car home that evening without any assistance from Mr. Campbell. Later she was quickly able to arrange, through her constant contact with the Respondents, for Mr. Motroni to be dispatched for that purpose. The fact that this alternative was not exercised until after Mr. Campbell drove into the waiting police stakeout is further confirmation of their intent to effect his arrest.

13

9:28 p.m., Ms. Personius sent a text to Respondent DIACO. Immediately thereafter, Respondent DIACO made a phone call to Respondent FILTHAUT. Immediately following that, Respondent FILTHAUT sent a text to Sergeant Fernandez. One minute later, at 9:29 p.m., Sergeant Fernandez sent a MDT text message to Officer McGinnis, who was part of the stakeout, which read *"leaving bar now,"* referring to Mr. Campbell. Since Mr. Campbell had hardly walked out into the parking area before this whole exchange, it clearly demonstrates how diligently Ms. Personius was keeping the Respondents informed about what was happening. Her information was immediately relayed to the DUI Squad through Respondent FILTHAUT's communication with Sergeant Fernandez.

When Sergeant Fernandez informed Officer McGinnis that Mr. Campbell was leaving the bar at Malio's, both officers were under the impression that Mr. Campbell would be driving his black BMW. Officer McGinnis sent an MDT text to Sergeant Fernandez which read *"blk convertible?"* At 9:31 p.m., Sergeant Fernandez replied *"BMW_yes."* At the same time, Ms. Personius was having her own text exchanges. At 9:32 p.m., she received a text from Respondent FILTHAUT. At 9:35 p.m., she received a text from Respondent DIACO. At 9:36 p.m., she sent a text to Respondent FILTHAUT. At 9:37 p.m., she got a text back from Respondent FILTHAUT. At 9:39 p.m., she got another text from Respondent FILTHAUT. At 9:42 p.m., she got another text from Respondent FILTHAUT.

14

Immediately after, she made a 57 second phone call to Respondent FILTHAUT, which was followed by another text from Respondent FILTHAUT at 9:44 p.m. She immediately made another phone call to Respondent FILTHAUT, that one lasting 53 seconds. At 9:45 p.m., she sent a text to Respondent FILTHAUT. At 9:48 p.m., she got a text from Respondent ADAMS, which was immediately followed by a call to Respondent ADAMS at 9:49 p.m. that lasted 46 seconds. She then received a text from Respondent ADAMS at 9:52 p.m. At 9:53 p.m. and 9:54 p.m., she got texts from Respondent FILTHAUT. During that same minute, she got a text from Respondent DIACO and sent another to Respondent ADAMS. During these exchanges, Ms. Personius obviously informed Respondent FILTHAUT that Mr. Campbell did not plan to leave Malio's in his own vehicle, since he didn't have one there, and instead would be driving her Nissan. Some or all of this was passed on to Sergeant Fernandez who, at 9:51 p.m., sent another MDT text to Officer McGinnis that read *"dark Nissan...valet malios."* Sergeant Fernandez asked Officer McGinnis to drive by Malio's to *"see if you see it"* at 9:51 p.m. Officer McGinnis did so and reported back *"female driving"* at 9:54 p.m.

Officer McGinnis had been misled into believing a female would be driving because he had observed Ms. Personius near the driver's door of her car at Malio's valet stand. However, the Respondents knew that Mr. Campbell would be driving, because Ms. Personius had told them. It was therefore unnecessary to advise

15

-28-

Sergeant Fernandez about anything other than which car he was to target. As Mr. Campbell pulled out of Malio's parking lot at approximately 9:57 p.m. that night, the Respondents and their employee, Ms. Personius, knew that the trap was set.

Almost immediately after the Nissan left Malio's, Sergeant Fernandez, who was off duty and driving an unmarked car, pulled Mr. Campbell over for a traffic stop. He claimed that Mr. Campbell had made an illegal right turn from a through lane on Ashley Street across a right turn lane and into an intersecting street. No one else observed this driving. Officer McGinnis arrived immediately thereafter, and Sergeant Fernandez turned Mr. Campbell over to him for what became a typical DUI investigation. Mr. Campbell was arrested, handcuffed, and taken to the County Jail.

Although the law provides that vehicles used in a DUI be impounded, Sergeant Fernandez, as leader of the unit, was authorized to waive that requirement if a sober driver was available. He did so after more text messages with Respondent FILTHAUT. Sergeant Fernandez had already communicated to Respondent FILTHAUT that he could not release the car to Ms. Personius because her driver's license was suspended. Phone records show that Ms. Personius, after several conversations with Respondent ADAMS, called associate Mr. Motroni, who was dropped off at the scene.

16

Mr. Motroni drove Ms. Personius and her car to her home in Brandon. Waiting for her there, and caring for their two children, was her ex-husband and then current roommate Kristopher Personius. The Personius's marriage had been dissolved for seven years, but their relationship continued. At trial, Mr. Personius testified to the following: when Ms. Personius arrived home she admitted to him in an excited state that she had participated in setting up Mr. Campbell at the direction of her employers, specifically Respondent ADAMS and Respondent DIACO. She told him that the Respondents were looking to set Mr. Campbell up, that she had been directed to go to Malio's to spy on him and *"get him to stay longer and drink more,"* and that Respondent DIACO and Respondent ADAMS were *"going to Adam Filthaut, too, to get the cop in place."* Ms. Personius also said that she had made Mr. Campbell drive and told her ex-husband that she *"got him"* and *"made him drive my car."* Mr. Personius further testified that Ms. Personius stated that Respondent DIACO had told her that she would receive a big bonus and would be his best-paid paralegal. All of these admissions occurred in the presence of not only Mr. Personius, but also Mr. Motroni who, after driving her car home, was waiting for a cab. Mr. Motroni refused to testify at trial on Fifth Amendment grounds.

Credible support for Mr. Personius's account of the evening's events came from another witness at trial, Lyann Goudie, Esq. Ms. Goudie is a former

17

prosecutor and experienced criminal defense attorney in Tampa. After the arrest of Mr. Campbell and the intense media attention that followed, Mr. and Ms. Personius were still living together in Brandon when the FBI arrived on the morning of May 23, 2013, with a search warrant. Several days later, Mr. Personius was contacted by an FBI representative who wanted to discuss the events of January 23, 2013. Mr. Personius told his ex-wife about the call, and she told him not to talk to them. Immediately thereafter, Ms. Personius's attorney, Todd Foster, who was being paid by Adams & Diaco, arranged for Mr. Personius to consult with Ms. Goudie. Adams & Diaco also paid Ms. Goudie $2,500 for her representation of Mr. Personius. Mr. Personius's knowledge of events was important enough to Adams & Diaco that they paid for an attorney to represent him before the FBI. Yet, each Respondent failed to disclose Mr. Personius as a person with knowledge of the events of January 23, 2013, in response to The Florida Bar's interrogatories during discovery in this matter.

At trial, Ms. Goudie testified that Mr. Personius had waived the attorney/client privilege regarding her representation of him, and she was free to answer any questions about their privileged discussions. She then described how Mr. Personius had come to her in early June 2013, because the FBI wanted to talk with him. He told her that the publicity regarding his ex-wife's role in the Campbell matter had hurt his teenage daughters because their unusual last name

18

was so recognizable, and he didn't want to get drawn in further. Ms. Goudie further testified that Mr. Personius related to her the events that occurred when Mr. Motroni brought Ms. Personius home after Mr. Campbell's arrest on January 23, 2013. Her recounting of his description of the events of that night was consistent with the testimony Mr. Personius gave at trial.

During Ms. Goudie's consultation with Mr. Personius, he voiced no animosity toward his ex-wife or her employer. Essentially, he wanted to avoid any involvement and be left alone. Further, during that consultation, Mr. Personius also advised Ms. Goudie that he had recorded a video that night on his cell phone that included his wife's admissions regarding the plan to set up and arrest Mr. Campbell. Ms. Goudie told him that the recording might be considered illegal if it was done without the consent of his ex-wife, and that if he was going to share it with anyone, it should be the FBI. According to allegations contained in motions filed prior to trial, the recording that Mr. Personius made of his ex-wife on the night of January 23, 2013, is now in the possession of the FBI. It was not offered into evidence at the trial and its contents are unknown to the Referee. But the testimony that Mr. Personius gave at trial, regarding the admissions of his ex-wife on the night of Mr. Campbell's arrest, is credible not only because it was not recently fabricated, but also because it was supported by the other credible evidence and testimony in the case.

19

Ms. Personius's active participation in the events surrounding the set up and arrest of Mr. Campbell essentially ended when Mr. Motroni drove her home that night in her car. However, before moving on to subsequent events, there are additional facts regarding her participation that require some comment. The first fact concerns the state of Ms. Personius's sobriety that night. It was previously noted that several people commented that she appeared intoxicated during the evening. That was the impression Mr. Campbell testified he had at the time he decided to leave Malio's. Regardless of the amount of alcohol she consumed that night, the evidence clearly shows that Ms. Personius was capably providing the Respondents with a constant stream of texts and voice calls from the time she first noticed Mr. Campbell at Malio's through the events that led to his arrest and thereafter. Ms. Personius was also alert enough regarding what she had said and done that night to attempt to cover her tracks. Early the next morning, she texted Nate Carney: *"if someone calls looking for me tell them you don't know me or don't tell them who I am."* Mr. Carney, who testified at trial, was the attorney at Trenam Kemker that Ms. Personius falsely told Mr. Campbell and Mr. Ellis she worked for. The Referee found Mr. Carney's testimony to be credible. Two days later, Ms. Personius also called and left a message on Vanessa Fykes phone to let her know that an investigator for Adams & Diaco would be calling her to "prep" her regarding any questions about the evening's events that she might subsequently

be asked. Ms. Fykes, after seeing news reports the morning following the arrest, cut off any further communication with Ms. Personius. Ms. Fykes also refused to return numerous calls from the Adams & Diaco investigator and those of Respondent DIACO himself. The Referee also found her testimony regarding these events to be credible.

When called to testify at trial, Ms. Personius refused to answer every question that she was asked after giving her name. She claimed her right to remain silent under the Fifth Amendment. She had also made the same assertion of rights before Judge Arnold when she was asked about the events of the night of January 23 during the hearing on the Motion for Mistrial in the *Schnitt v. Clem* case. In doing so, she subjected herself and the Respondents to the adverse inferences that are appropriate to impose, given the nature of all the other evidence in this case. *Coquina Investments v. TD Bank, N.A.,* 760 F.3d 1300 (11th Cir. 2014); *Atlas v. Atlas,* 708 So. 2d 296, 299 (Fla. 4th DCA 1998).

Prior to this matter being filed, when Ms. Personius was interviewed by the Pinellas County State Attorney's Office regarding Mr. Campbell's DUI charge (it had been transferred from Hillsborough), she admitted her involvement. When she was questioned regarding her many phone calls and text messages with the Respondents that evening, however, she consistently denied any recollection. Given the sheer volume of texts and phone calls and the significance of the night,

21

that was simply not credible. In addition, the fact that she continues working for the Respondents' firm, that she received a $9,000 bonus for 2013, a $6,500 raise, and a credit card paid for by Adams & Diaco all support the conclusion that her conduct on the night of January 23, 2013, was known and approved by the Respondents.

The active participation of all of the Respondents in the effort to effect the arrest of Mr. Campbell is beyond dispute. Respondent DIACO directed Respondent ADAMS to call Respondent FILTHAUT when he first learned that Mr. Campbell was at Malio's that evening. Respondent DIACO was aware that Respondent FILTHAUT's close relationship with Sergeant Fernandez would result in the Tampa Police Department's DUI Squad making another special effort to target Mr. Campbell, as it had attempted in November. Respondent DIACO was aware that Ms. Personius was drinking with Mr. Campbell at Malio's and that she was passing on updates regarding their activities to him and the other Respondents. He was aware that her information was being shared with Sergeant Fernandez on a regular basis through Respondent FILTHAUT. He was aware that Mr. Campbell would be driving Ms. Personius's car from Malio's and that the vehicle information had been provided to Sergeant Fernandez. He maintained constant contact with the other Respondents throughout the evening as the plan progressed, and did nothing to discontinue the effort directed at Mr. Campbell's arrest.

22

Respondent DIACO was an attorney with supervisory authority over Respondent FILTHAUT, associate Mr. Motroni, and nonlawyer employee Ms. Personius. Respondent DIACO failed or refused to properly supervise Respondent FILTHAUT, associate attorney Mr. Motroni, and nonlawyer employee Ms. Personius that evening and thereafter.

Respondent DIACO refused to testify for a deposition and at trial on Fifth Amendment grounds. When questioned by Judge Arnold regarding the evening of January 23 during the *Schnitt v. Clem* case, he either invoked his right to the Fifth Amendment, claimed he could not recall conversations or events that occurred less than 48 hours earlier, or denied any active participation. Respondent DIACO's memory had improved by the time he filed an affidavit on March 4, 2013, in opposition to a Motion for New Trial in *Schnitt v. Clem*. Respondent DIACO swore that his involvement in the events of the night of Mr. Campbell's arrest consisted of *"respond[ing] to requests for information made by the Tampa Police Department."* That statement is so misleading and so far from the truth regarding the known events of that night that it amounts to a deliberate falsehood. The Referee infers from Respondent DIACO's silence at trial that truthful responses

23

would have further demonstrated his complicity in the conspiracy proven by clear and convincing evidence to exist. *Baxter v. Palmigiano*, 425 U.S. 308 (1976).[2]

Respondent ADAMS was also a major participant in the conspiracy to effect the arrest of Mr. Campbell. The clear and convincing evidence establishes that he was aware of the November 29, 2012 attempt to arrest Mr. Campbell. He did not advise Respondent FILTHAUT against using his friendship with Sergeant Fernandez to effect the arrest of Mr. Campbell. Instead, he called Respondent FILTHAUT early on the evening of January 23, 2013, at the request of Respondent DIACO, to accomplish a DUI Squad stakeout of Malio's with the specific intent of seeking Mr. Campbell's arrest. He was aware that Ms. Personius was drinking with Mr. Campbell at Malio's and that she was passing on updates regarding their activities to him and the other Respondents. He was aware that her information was being shared with Sergeant Fernandez on a regular basis through Respondent FILTHAUT. He was aware that Mr. Campbell would be driving Ms. Personius's car from Malio's and that the vehicle information had been provided to Sergeant Fernandez. He maintained constant contact with the other Respondents throughout the evening as the plan progressed and did nothing to discontinue the effort to

_____

[2] The Florida Bar has also cited *The Florida Bar v. Garcia*, 31 So. 3d 782 (Fla. 2010) to support the proposition that the Referee may impose an adverse inference against the Respondents as a result of their refusal to testify on Fifth Amendment grounds. *Garcia* is an unreported case and the Referee has no access to an opinion or the record to confirm The Florida Bar's assertion.

24

arrest Mr. Campbell. Respondent ADAMS was an attorney with supervisory authority over Respondent FILTHAUT and nonlawyer employee Ms. Personius. Respondent ADAMS failed or refused to properly supervise Respondent FILTHAUT and nonlawyer employee Ms. Personius on that evening or thereafter.

Respondent ADAMS also twice refused to answer any questions regarding his conduct at depositions scheduled by The Florida Bar during these proceedings. His counsel maintained, until the morning of trial, that Respondent ADAMS and the other Respondents would not testify based upon their Fifth Amendment rights against self-incrimination. On the first day of trial, after Respondent DIACO had so refused, Respondent ADAMS took the witness stand and indicated that he would testify. The Florida Bar was unprepared to proceed regarding Respondent ADAMS, since he had twice before declined to answer any questions in discovery. The Referee allowed a short recess of the trial for the purpose of permitting The Florida Bar to depose Respondent ADAMS before he testified.

When he again took the witness stand, Respondent ADAM's testimony was crafted to admit those facts that he knew from discovery he could not deny and to present a set of circumstances that put him in the most favorable light possible. Much of his testimony concerned the content of text messages and phone communications during January 23-24, 2013, between himself, the other Respondents, and Ms. Personius — all of which Respondent ADAMS admitted he

25

had deleted. His testimony about this unverifiable content defied common sense and was inconsistent with the other evidence presented at trial. Thus, while Respondent ADAMS avoided the adverse inference that could be properly imposed for his refusal to testify, his less-than-credible testimony given at the eleventh hour did nothing to aid in his defense.

Respondent FILTHAUT's close personal relationship with Sergeant Raymond Fernandez was the single most important factor that allowed the Respondents to plot the arrest of Mr. Campbell. Without the trust and long years of friendship that existed between Respondent FILTHAUT and Sergeant Fernandez, it seems doubtful that the Tampa Police Department would have devoted the resources to spend the better part of three hours staking out a bar for one potentially impaired driver on the unverified "tip" of one citizen. The fact that the DUI Squad did this, not once, but on two separate occasions is a testament to the influence Respondent FILTHAUT was able to exert. To accomplish that, Respondent FILTHAUT betrayed the trust of Sergeant Fernandez by lying to him regarding Mr. Campbell's habit of drinking and driving. The Respondents produced no evidence at trial regarding Mr. Campbell's drinking habits. Nothing was offered to suggest, as Respondent FILTHAUT had assured his friend, that Mr. Campbell *"gets drunk all the time. He goes to Malio's and drinks it up and then he drives home drunk."* The evidence at trial was just the opposite. Both the bartender

26

and the manager at Malio's testified that Mr. Campbell would come in one or two times a week, have one or two drinks, and walk home to his apartment. Respondents made no attempt to prove otherwise.

The most important information that Respondent FILTHAUT knew about Mr. Campbell and the events taking place at Malio's was withheld from his friend. Sergeant Fernandez was never told that Mr. Campbell was the opposing attorney in a multi-million dollar lawsuit that Adams & Diaco, P.A. were defending. Nor was Sergeant Fernandez told that the person inside Malio's who was providing the information about Mr. Campbell's status was an Adams & Diaco employee who was buying him drinks while she passed on information to the Respondents. He learned of Mr. Campbell's position as an opposing attorney the next morning when the arrest became headline news. Sergeant Fernandez confronted his friend about failing to share that important fact. Respondent FILTHAUT responded, *"Well, Ray, what's the big deal?"* Sergeant Fernandez was later discharged from the Tampa Police Department as a result.

Respondent FILTHAUT, in addition to misleading his friend in furtherance of the conspiracy, played an active role in orchestrating the events of January 23, 2013. He maintained regular contact with the other Respondents, Ms. Personius, and Sergeant Fernandez throughout the evening as the plan progressed, and did nothing to discontinue the effort directed at Mr. Campbell's arrest. Respondent

27

FILTHAUT's immediate and direct connection to the commander of the Tampa Police DUI Squad allowed him to coordinate the arrest by passing on exactly where Mr. Campbell was, what he was doing, when he was doing it, and what car to target when the time came.

Respondent FILTHAUT also twice refused to be deposed regarding the events surrounding these proceedings and refused to answer any questions at trial, based upon his right against self-incrimination under the Fifth Amendment. He specifically refused at trial to respond to a question confirming that he had erased, secreted, or otherwise destroyed the actual cell phone messages that would constitute direct evidence of the nature of his communications that night. The Referee has indulged all the adverse inferences that may permissibly be imposed as a result. *Martino v. Wal-Mart Stores Inc.*, 835 So. 2d 1251 (Fla. 4th DCA 2003); *Baxter v. Palmigiano*, 425 U.S. 308 (1976); *Atlas v. Atlas*, 708 So. 2d 296, 299 (Fla. 4th DCA 1998); *Fraser v. Security and Investment Corporation*, 615 So. 2d 841 (Fla. 4th DCA 1993); *New Hampshire Ins. Co., v. Royal Ins. Co.*, 559 So. 2d 102 (Fla. 4th DCA 1990). In addition, the wealth of testimony provided by Sergeant Fernandez in various forums before these proceedings were commenced further confirmed that Respondent FILTHAUT's active participation is beyond dispute.

28

Respondent FILTHAUT, through his counsel's opening statement and his arguments regarding the "guilt phase" and the "sanctions phase" of the trial, suggested that he was only an associate at Adams & Diaco and that his participation in the setup and arrest conspiracy was solely the result of following the orders of his superiors, presumably Respondents DIACO and ADAMS. That variation of the Nuremburg Defense is only available when the conduct ordered is *"in accordance with a supervisory lawyer's reasonable resolution of an arguable question of professional duty."* Rule 4-5.2. The Referee finds that using a nonlawyer employee to set up the opposing attorney for arrest in a multi-million dollar, high profile jury trial doesn't conceivably fall within that exception.

## II.

**Respondent DIACO, following an 8:30 a.m. hearing on January 24, 2013, during which all parties agreed to a brief continuance of the ongoing jury trial, made public statements to the news media criticizing the conduct of Mr. Campbell and falsely claiming that Respondent did not agree with the recess of the trial. Respondent DIACO's comments failed to disclose his own active participation in the events that resulted in the recess or the participation of Respondents ADAMS, FILTHAUT, and others.**

On the morning of January 24, 2013, Mr. Ellis, Mr. Campbell's co-counsel, asked Judge Arnold for a recess in the *Schnitt v. Clem* trial. He proposed giving the jury the day off and working on jury instructions instead. Mr. Campbell's trial bag containing all of his notes and witness preparation for that morning's testimony had been left in the back seat of Ms. Personius's car when the arrest occurred.

29

Judge Arnold had previously planned to recess after the morning session, even before Mr. Campbell's arrest. In light of the disruption caused by the arrest and Mr. Campbell's inability to locate his trial bag, counsel for all parties agreed to the recess as a professional courtesy. It was decided that testimony would resume the next day. While Mr. Campbell and his partner continued their search for the missing trial bag, Respondent DIACO appeared outside the courthouse and gave interviews to the media about the case. These are examples of some of the statements Respondent DIACO made that appeared later that day as sound bites on various local television news programs:

> *"Well, you know, I'm shocked that the case was continued. I feel horrible for this jury that has been sequestered and pulled from the jobs, their lives, their families. And so now we have to wait."*

> *"Well, you know, I don't know exactly what the jury has been told, and, you know, they are supposed to be sequestered and not watching the news or hearing the reports, but this is front page news now."*

> *"And this is his second time. So it's just —you know, the whole thing makes me embarrassed to be an attorney, and I'm ashamed of all this whole process has continued to be a mockery of the system. But we believe in the system. We believe in the jury, and we're going to let Bubba's peers decide this case."*

> *"We were prepared for today. We were working last night in preparation for the trial. And so now we have to wait. The jury has to wait, and we have to see how this plays out. I don't understand why his other partners who have been in there every single day of the trial, can't continue this case."*

30

*"I hope he gets help. My partner and Greg Hearing were working on this trial last night. Phil didn't seem to be doing the same. And now we're being penalized."*

*"Shocked, shocked, disappointed, sad, sad for the jury having to be taken out of their lives another day that this is continued. Two other partners have been trying this case every single day. I don't understand why it was continued."*

*"To his advantage, now he gets a good night's sleep. Now he gets to prepare his witnesses."*

*"His last DUI was almost twice the legal limit. He didn't learn his lesson."*

At the time those statements and others of a similar nature were made, Respondent DIACO knew that his firm and all other counsel had agreed to the short recess. He also knew, or should have reasonably anticipated, that his statements would receive a great deal of public exposure in the media. They did. The next day, partially as a result of those statements, Mr. Ellis moved for a mistrial in *Schnitt v. Clem*. Judge Arnold felt compelled to question each of the jurors to determine if they had seen or heard anything regarding Mr. Campbell's arrest. One juror had learned of Mr. Campbell's arrest, but Judge Arnold was satisfied that the trial could go forward. Respondent DIACO offered no evidence at trial to explain why he made false statements to the news media about the short stipulated recess of the trial, and there was no explanation for his public "piling on" of Mr. Campbell. Nor was there evidence presented at trial to justify Respondent DIACO's efforts to publically criticize and humiliate Mr. Campbell in

31

the media when Respondent had full knowledge of the part he and the other members of his firm played in the arrest. The Referee infers, from Respondent DIACO's refusal to testify regarding these issues, that his purpose in making those public statements was to potentially influence any jurors that might have heard them and to otherwise gain an advantage in the ongoing trial.

### III.

**On January 24, 2013, Respondents DIACO and ADAMS became aware that the trial bag belonging to Mr. Campbell had been left in the car of Adams & Diaco, P.A.'s paralegal Ms. Personius. Neither Respondent DIACO, Respondent ADAMS, nor Brian Motroni, another member of the firm who also learned this fact, made any effort to immediately return Mr. Campbell's property to him or to advise him that it was in their possession.**

On the morning of January 24, 2013, testimony in the *Schnitt v. Clem* trial was scheduled to resume at 9:00 a.m. After his release from jail at approximately 6:30 a.m., Mr. Campbell and Mr. Ellis began their search for Mr. Campbell's missing trial bag. Initially, it was presumed that this would simply involve contacting Trenam Kemker and retrieving the bag from the car of their paralegal. Upon inquiring, they learned that there was no paralegal named "Melissa" at Trenam Kemker. The trial bag was still not located when Mr. Campbell and Mr. Ellis entered the courtroom for the continuation of the trial. Judge Arnold considered the circumstances of Mr. Campbell's arrest and was amenable to Mr. Ellis's Motion for Recess, delaying testimony until the next day. All counsel

32

agreed, out of professional courtesy to Mr. Campbell, to give the jury the day off. Counsel were to remain for a jury instruction conference that morning. After the morning session, Mr. Campbell and Mr. Ellis went back to their office to continue the search for the missing trial bag.

Between 10:00 p.m. on January 23, 2013, and approximately 5:00 p.m. on January 24, 2013, Mr. Campbell's trial bag containing his notes and witness preparation material was out of his possession. Mr. Ellis and Mr. Campbell did not discover who had possession of the bag until around 4:00 p.m. on January 24. During that 19-hour period, the bag was in the sole possession of members of the Adams & Diaco firm or their employees.

The evidence regarding who possessed the bag, for how long, and what was done with it was derived almost exclusively from four sources. First, there was testimony from Respondent DIACO, Ms. Personius, and associate Mr. Motroni at a hearing on a Motion for Mistrial before Judge Arnold on the afternoon of January 25, 2013. Secondly, there was testimony from Ms. Personius given on May 23, 2013, during the DUI investigation. Thirdly, there were statements made by Mr. Motroni before Richard Martin, Esq., the investigating member to the Thirteenth Circuit Grievance Committee on April 30, 2014. Finally, though Respondent DIACO, Ms. Personius, and Mr. Motroni each refused to testify at trial regarding this matter on Fifth Amendment grounds, there was the trial testimony of

33

Respondent ADAMS. His testimony, however, was given after twice refusing to answer questions at scheduled depositions and after all other discovery was completed and disclosed. In the testimony prior to trial and at the trial itself (in regard to Respondent ADAMS only), the account of the possession and activity surrounding Mr. Campbell's trial bag was consistent. Mr. Personius also confirmed some aspects of the saga involving the discovery of the bag and its eventual return, although it is difficult to ascertain whether his knowledge was first hand or as a result of what Ms. Personius told him. The following is their account, pieced together from the various sources in the record and at trial.

The morning after Mr. Campbell's arrest, Ms. Personius was told not to come into the office. Around noon, Ms. Personius claimed she discovered Mr. Campbell's briefcase on the back seat of her car and called Respondent ADAMS to tell him. Respondent ADAMS saying he was too busy to deal with it, told Respondent DIACO about it. Respondent DIACO told him that he would take care of it, and tasked Mr. Motroni with retrieving the briefcase. The pass card records for the garage indicated that Mr. Motroni's car left the Bank of America building at 1:46 p.m.

Mr. Motroni claimed that upon arriving at the Personius home, he discovered that the briefcase was a large trial bag. Mr. Motroni called Respondent DIACO at 2:07 p.m. and was instructed to bring the trial bag to the Adams &

Diaco offices. The pass card records indicate that he re-entered the building's parking garage at 2:19 p.m. The bag remained at the Bank of America building from then until Mr. Motroni and Respondent DIACO left with the bag at 3:23 p.m. There was never a logical explanation given why Respondent DIACO, or Mr. Motroni, or some other member of the firm had not simply walked the trial bag to the Shumaker, Loop & Kendrick's offices in the same building. Nor was it ever explained why Mr. Campbell, or anyone at Shumaker, Loop & Kendrick, was not notified that his trial bag was in the building and that he could come and get it. Instead, Respondent DIACO, along with Mr. Motroni, drove the bag back to Ms. Personius's residence and left it with her to return. Respondent DIACO's said he took the bag back to her residence to question her about whether she had looked in the bag. Why he could not have just questioned her over the phone was never explained. Once Respondent DIACO and Mr. Motroni had driven the bag back to Ms. Personius's home, she was instructed to transport the bag back to the Bank of America building by cab and to see that it was delivered to a security officer in the lobby. The obvious intent was to have the bag returned anonymously. The evidence suggests that Respondent DIACO believed that Mr. Campbell would not discover the true identity of Ms. Personius and, therefore, never connect Adams & Diaco to his arrest. In fact, Respondent DIACO left a telephone message for Mr. Ellis that afternoon proposing a meeting of counsel, including Mr. Campbell, to

35

discuss settlement. Mr. Ellis returned the call while Respondent DIACO and Mr. Motroni were driving the trial bag back to Ms. Personius's home. Respondent DIACO made no mention of his possession of the trial bag during that telephone conversation.

After leaving the trial bag with Ms. Personius, Mr. Motroni and Respondent DIACO returned to their office in the Bank of America building, re-entering the parking garage at 4:21 p.m. Shortly before that time, Ms. Personius's true identity had been discovered. While driving back to the office, Respondent DIACO received another phone call from Mr. Ellis. Mr. Ellis confronted Respondent DIACO with the information that the identity of Ms. Personius was known and that she had possession of Mr. Campbell's trial bag. Respondent DIACO then told Mr. Ellis that the trial bag would be returned to the Bank of America building lobby. Mr. Ellis insisted that it be returned directly to the offices of Shumaker, Loop & Kendrick.

Sometime later, Ms. Personius took a taxi back to the Bank of America building, brought the bag into the lobby, and had the cab driver deliver it to Shumaker, Loop & Kendrick at about 5:15 p.m. By their own account, Respondents ADAMS and DIACO were in possession of Mr. Campbell's trial bag or knew that one of their employees had possession of it for over four hours.

36

Neither of them made any effort to contact Mr. Campbell or his firm to advise them of that fact. It was not returned until Mr. Ellis demanded it.

## IV.

**The actions of the Respondents, as set out above, and subsequent efforts to cover up or otherwise destroy evidence of those actions, were intended to disrupt, unfairly influence, and/or otherwise prejudice the tribunal, the administration of justice, opposing attorney Mr. Campbell and/or opposing parties in ongoing litigation in which the Respondents' law firm was engaged.**

Even before Respondents became aware that the identity of Ms. Personius had been discovered, they began to withhold, destroy, or otherwise secrete the direct evidence of their involvement in Mr. Campbell's arrest. The first indication of the Respondents' efforts to hide their participation was their refusal to notify Mr. Campbell that they were in possession of his trial bag on the day following the arrest. Another example occurred later that afternoon, when Mr. Ellis's process server was locked out of the Adams & Diaco offices, even though there were obviously people working inside. Mr. Ellis, Mr. Campbell's partner, was attempting to subpoena Respondent DIACO for a hearing before Judge Arnold the next morning, January 25, 2013. The hearing concerned Shumaker, Loop & Kendrick's motion for mistrial of the *Schnitt v. Clem* case. The motion was based upon the Respondent's possession and retention of Mr. Campbell's trial bag and the false and inflammatory comments made by Respondent DIACO to the media

37

the morning after Mr. Campbell's arrest. The subpoena also demanded that Respondent DIACO produce his cell phone at the hearing.

Although the process server was locked out of the Adams & Diaco offices the day before, he was able to serve the Respondent through his wife early the next morning, January 25, 2013. Regardless, Respondent DIACO failed to appear at the morning hearing on that date. He had already hired counsel to appear on his behalf and move for a protective order. Judge Arnold commented at trial that his immediate concern was the exposure the jury may have had to all the publicity surrounding Mr. Campbell's arrest, rather than Respondent DIACO's disregard of the subpoena. The Judge did, however, insist that Respondent DIACO appear for a continuation of the Motion for Mistrial in the afternoon. Respondent DIACO appeared, but without his cell phone. When questioned about whether he had any conversations with Ms. Personius or Respondent FILTHAUT on the evening of Mr. Campbell's arrest, less than 48 hours earlier, Respondent DIACO replied that he couldn't remember. When asked who his cell phone carrier was, he said he didn't know. Respondent DIACO's obvious lies to Judge Arnold demonstrate the lengths to which he was willing to go to avoid discovery of evidence of his participation in the plot, which could have led to a mistrial of *Schnitt v. Clem*. Ms. Personius appeared at the same hearing and testified regarding the trial bag saga, but when questioned about whether she had been asked to meet and buy drinks for

38

Mr. Campbell, she too refused to testify on Fifth Amendment grounds. By that afternoon, Ms. Personius also had her own counsel, paid for by Adams & Diaco, and Respondent DIACO was represented by two attorneys, one for civil and apparently one for criminal liability. In order to complete the trial, Judge Arnold put a moratorium on discovery regarding the Motion for Mistrial which remained in effect until February 5, 2013. As a result, Mr. Campbell and Shumaker, Loop & Kendrick were unable to take steps to obtain the cell phone records or message transcripts from the phones of all the Respondents, their employees, or Sergeant Fernandez. All the Respondents had been provided with notices to preserve that data. Since then, all of the participants in the conspiracy to arrest Mr. Campbell have destroyed or secreted the cell phones and/or the important objective evidence they contained. Respondent ADAMS, Ms. Personius, and Sergeant Fernandez have all admitted erasure or destruction directly. Respondent ADAMS admitted that all the Respondents and Ms. Personius had turned their phones over to attorney Lee Gunn, but Respondent ADAMS refused to say why, claiming attorney-client privilege. At trial, both Respondent DIACO and Respondent FILTHAUT refused to answer any questions about the destruction of their cell phone messages and are subject to the adverse inference that they too have deliberately destroyed them. The cell phone messages on the Respondents' phones from the night of Mr. Campbell's arrest are the only objective evidence that could speak to their incrimination or

39

exculpation. The fact that they were erased, destroyed, or that the Respondents failed to produce them, strongly infers that they did not contain anything exculpatory.

Finally, the Respondents failed to offer any credible justification for their two-month effort to have Mr. Campbell arrested. Respondents' counsel suggested that the Respondents were motivated by a strong desire to keep intoxicated drivers off the streets. Although unsupported by evidence, such motivation would seem more plausible if it had not knowingly been the Respondents' own employee buying Mr. Campbell drinks and presenting him with the automobile to drive. It would also have appeared more believable if that employee had not been funneling information about Mr. Campbell directly through Respondents to waiting police surveillance. The Referee was presented with no competent evidence that would support any credible motive, except that the Respondents sought to gain some advantage in the ongoing civil case brought by Mr. Campbell's client. Respondent DIACO's affirmative efforts to propose settlement discussions with Mr. Ellis and Mr. Campbell before the identity of Ms. Personius was discovered further supports this finding.

Another argument suggested that Respondents should not be responsible for Mr. Campbell's decision to drink and drive that night. The argument's logic being that Mr. Campbell's decision to drive was an intervening independent event that

40

broke the chain of causation leading from their actions to his arrest. The argument has no merit. The acts of the Respondents on January 23 were not unethical because they ultimately resulted in Mr. Campbell's arrest. They were unethical because they were prohibited acts, and the Respondents willingly committed them. Ethical violations are not necessarily dependent upon the existence of harm or injury. Damage is not an indispensable element, as it might be in a civil case. If Mr. Campbell had walked away from Malio's valet that night and left Ms. Personius to her own devices, the Respondents' actions would have been just as unethical and egregious. The unsuccessful effort to target Mr. Campbell for arrest on November 29, 2012, was just as much a violation of Rules Governing The Florida Bar as the successful effort was on January 23, 2013.

Ultimately, the Referee was presented with nothing to suggest that Respondents' intent was anything other than what the clear and convincing evidence demonstrates. It was a deliberate and malicious effort to place a heavy finger on the scale of justice for the sole benefit of the Respondents and their client. For the Respondents, the harm inflicted on Mr. Campbell, his clients' cause, Sergeant Fernandez, the legal system, the profession, and the public's confidence in justice was simply collateral damage.

41

## Subsequent Events

The DUI arrest of Mr. Campbell was investigated by the State Attorney's Office for the Sixth Judicial Circuit, after the State Attorney for the Thirteenth Judicial Circuit recused his office from the case. On July 29, 2013, a *nolle prosequi* was filed. Mr. Campbell's arrest was subsequently expunged. Although evidence of the basis for refusing to prosecute was not adduced at trial, it appears that all of the statutory elements of a valid entrapment defense existed. Fla. Stat. §777.201.

Following the events of January 23-25, 2013, the *Schnitt v. Clem* jury trial was completed. There was a defense verdict. Following the trial, the Plaintiff's Motion for Mistrial was converted into a Motion for New Trial, and the restriction on discovery was lifted. Before an evidentiary hearing was held on the alleged misconduct of Defendant's counsel, the parties entered into mediation and agreed to a settlement.

After the settlement, the Schnitts discharged Mr. Campbell and the firm of Shumaker, Loop, & Kendrick from further representation. As of the date of trial, there was ongoing litigation between Shumaker, Loop, & Kendrick and their former clients regarding the payment of fees.

The Tampa Police Department, after an administrative personnel hearing, discharged Sergeant Raymond Fernandez from the force. Officer Tim McGinnis was removed from the DUI Squad.

42

Several witnesses at trial, as well as Respondent DIACO's counsel, have asserted that the United States Attorney for the Middle District of Florida is conducting a Federal grand jury investigation that is continuing. As of this date, no Federal criminal charges have been filed against the Respondents or others regarding the events described above.

## III. <u>RECOMMENDATIONS AS TO GUILT</u>

### A. <u>Stephen Christopher Diaco - No. 2013-10,735 (13F)</u>

I recommend that the Respondent be found guilty of violating **Rule 3-4.3** of the Rules of Discipline of The Florida Bar; and **Rule 4-3.4(a); Rule 4-3.4(g); Rule 4-3.5(c); Rule 4-3.6(a); Rule 4-4.4(a); Rule 4-5.1(c); Rule 4-5.3(b);** and **Rule 4-8.4(a), (c), and (d)** of Rules of Professional Conduct.

1. **Violation: Rule 3-4.3 (Misconduct and Minor Misconduct)**

   The clear and convincing evidence is that **STEPHEN CHRISTOPHER DIACO** conspired with Respondents ADAMS and FILTHAUT, employee Melissa Personius, and Sergeant Raymond Fernandez of the Tampa Police Department to improperly effect the arrest of C. Philip Campbell, Esq., and then attempted to cover-up or otherwise destroy evidence of his participation in that conspiracy contrary to honesty and justice.

2. **Violation: Rule 4-3.4(a) (unlawfully obstruct another party's access to evidence or other material)**

   The clear and convincing evidence is that **STEPHEN CHRISTOPHER DIACO** deliberately obstructed access to or concealed the trial bag of C. Philip Campbell, Esq.; destroyed and/or concealed his cell phone and/or its contents, which he knew or should have known were relevant to a pending or reasonably foreseeable proceeding; and refused to produce his cell phone or information about his cell phone provider at the January 25, 2013 hearing, which

43

he knew or should have known were relevant to a pending or reasonably foreseeable proceeding.

3. **Violation: Rule 4-3.4(g) (present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter)**

The clear and convincing evidence is that **STEPHEN CHRISTOPHER DIACO** conspired with Respondents ADAMS and FILTHAUT, employee Melissa Personius, and Sergeant Raymond Fernandez of the Tampa Police Department to improperly effect the arrest of C. Philip Campbell, Esq., solely to obtain an advantage in an ongoing litigation.

4. **Violation: Rule 4-3.5(c) (conduct intended to disrupt a tribunal)**

The clear and convincing evidence is that **STEPHEN CHRISTOPHER DIACO** conspired with Respondents ADAMS and FILTHAUT, employee Melissa Personius, and Sergeant Raymond Fernandez of the Tampa Police Department to improperly effect the arrest of C. Philip Campbell, Esq., with the intent that it disrupt an ongoing civil trial.
2Violation: Rule 4-3.6(a) (prejudicial extrajudicial statements

5. **Violation: Rule 4-3.6(a) (prejudicial extrajudicial statements prohibited)**

The clear and convincing evidence is that **STEPHEN CHRISTOPHER DIACO** made statements to the media on January 24, 2013, regarding: his disagreement with the Court granting a stipulated trial recess; the arrest of C. Philip Campbell, Esq.; and the work ethic and prior history of Mr. Campbell. All statements were made with the knowledge that there was a substantial likelihood of materially prejudicing the ongoing jury trial.

6. **Violation: Rule 4-4.4(a) (means that have no substantial purpose other than to embarrass, delay, or burden)**

The clear and convincing evidence is that **STEPHEN CHRISTOPHER DIACO** deliberately failed to immediately return the trial bag of C. Philip Campbell, Esq. or notify him or his firm of the bag's location in order to delay or burden Mr. Campbell in an ongoing trial.

44

7. **Violation: Rule 4-5.1(c) (Responsibilities of partners, Managers and Supervisory Lawyers)**

The clear and convincing evidence is that **STEPHEN CHRISTOPHER DIACO** deliberately conspired with or otherwise ordered or ratified the conduct of Respondents ADAMS and FILTHAUT regarding their actions taken to improperly effect the arrest of C. Philip Campbell, Esq. and/or failed to take remedial action to avoid or mitigate the foreseeable potential results of those wrongful actions. Further Respondent DIACO ordered or ratified the conduct of associate Brian Motroni in concealing the trial bag of Mr. Campbell. As an attorney with managerial authority, Respondent DIACO was responsible for the conduct of Respondent FILTHAUT and attorney Brian Motroni.

8. **Violation: Rule 4-5.3(b) (Responsibilities Regarding Nonlawyer Assistants)**

The clear and convincing evidence is that **STEPHEN CHRISTOPHER DIACO** conspired with, ordered and/or ratified the conduct of his nonlawyer employee, Melissa Personius, to improperly effect the arrest of C. Philip Campbell, Esq. and conceal his trial bag; failed to take appropriate remedial action when he knew that the consequences of her conduct could be avoided; and failed to make reasonable efforts to ensure that her conduct was compatible with Respondent's professional obligations. As an attorney with managerial authority, Respondent DIACO was responsible for the conduct of Melissa Personius.

9. **Violation: Rule 4-8.4(a), (c), and (d) (Violating or Promoting Violation of Rules of Professional Conduct; Engaging in conduct involving dishonesty, fraud or deceit; Conduct in connection with the practice of law that is prejudicial to the administration of justice)**

The clear and convincing evidence is that **STEPHEN CHRISTOPHER DIACO** conspired with Respondents ADAMS and FILTHAUT, nonlawyer employee Melissa Personius, and Sergeant Raymond Fernandez of the Tampa Police Department to improperly effect the arrest of C. Philip Campbell, Esq., and covered up or otherwise destroyed evidence of his participation in that conspiracy. Respondent DIACO further engaged in fraudulent, dishonest, or

45

deceitful conduct by lying to Judge Arnold on January 25, 2013, regarding his knowledge of his cell phone provider and his recollection of discussions or communications with Melissa Personius and Respondent FILTHAUT on the evening of January 23, 2013. He further engaged in misleading and deceitful conduct by making public statements to the news media that were intended to embarrass and humiliate opposing counsel in regard to his arrest for DUI on the previous evening without disclosing his own active role in those events or the role played by the other Respondents, his employee Melissa Personius, and that of Sergeant Raymond Fernandez. In addition, this conduct delayed the ongoing litigation and required Judge Arnold to interview the jurors regarding this trial publicity.

## B. Robert D. Adams - No. 2013-10,736 (13F)

I recommend that the Respondent be found guilty of violating **Rule 3-4.3** of the Rules of Discipline of The Florida Bar; and **Rule 4-3.4(a); Rule 4-3.4(g); Rule 4-3.5(c); Rule 4-4.4(a); Rule 4-5.1(c); Rule 4-5.3(b); and Rule 4-8.4(a), (c), and (d)** of Rules of Professional Conduct.

### 1. Violation: Rule 3-4.3 (Misconduct and Minor Misconduct)

The clear and convincing evidence is that **ROBERT D. ADAMS** conspired with Respondents DIACO and FILTHAUT, employee Melissa Personius, and Sergeant Raymond Fernandez of the Tampa Police Department to improperly effect the arrest of C. Philip Campbell, Esq., and then attempted to cover-up or otherwise destroy evidence of his participation in that conspiracy.

### 2. Violation: Rule 4-3.4(a) (unlawfully obstruct another party's access to evidence)

The clear and convincing evidence is that **ROBERT D. ADAMS** deliberately concealed the trial bag of C. Philip Campbell, Esq. and destroyed and/or concealed his cell phone and/or its contents, which he knew or should have known were relevant to a pending or reasonably foreseeable proceeding.

46

3. **Violation: Rule 4-3.4(g) (present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter)**

The clear and convincing evidence is that **ROBERT D. ADAMS** conspired with Respondents DIACO and FILTHAUT, employee Melissa Personius, and Sergeant Raymond Fernandez of the Tampa Police Department to improperly effect the arrest of C. Philip Campbell, Esq., solely to obtain an advantage in an ongoing civil litigation.

4. **Violation: Rule 4-3.5(c) (conduct intended to disrupt a tribunal)**

The clear and convincing evidence is that **ROBERT D. ADAMS** conspired with Respondents DIACO and FILTHAUT, employee Melissa Personius, and Sergeant Raymond Fernandez of the Tampa Police Department to improperly effect the arrest of C. Philip Campbell, Esq., with the intent that it disrupt an ongoing civil trial.

5. **Violation: Rule 4-4.4(a) (means that have no substantial purpose other than to embarrass, delay, or burden)**

The clear and convincing evidence is that **ROBERT D. ADAMS** failed to immediately return the trial bag of C. Philip Campbell, Esq. or notify him or his firm of the bag's location in order to delay or burden Mr. Campbell in an ongoing trial.

6. **Violation: Rule 4-5.1(c) (Responsibilities of Partners, Managers, and Supervisory Lawyers)**

The clear and convincing evidence is that **ROBERT D. ADAMS** deliberately conspired with or otherwise ordered or ratified the conduct of Respondents DIACO and FILTHAUT regarding their actions taken to improperly effect the arrest of C. Philip Campbell, Esq., and/or failed to take remedial action to avoid or mitigate the foreseeable potential results of those wrongful actions. Respondent ADAMS ordered Respondent FILTHAUT to contact Sergeant Raymond Fernandez of the Tampa Police Department in furtherance of the effort to effect Mr. Campbell's arrest; Respondent ADAMS was aware of Respondent FILTHAUT's prior improper conduct and ratified it. As an attorney with managerial authority, Respondent ADAMS was responsible for the conduct of Respondent FILTHAUT.

47

7. **Violation: Rule 4-5.3(b) (Responsibilities Regarding Nonlawyer Assistants)**

The clear and convincing evidence is that **ROBERT D. ADAMS** conspired with, ordered and/or ratified the conduct of his nonlawyer employee, Melissa Personius, to improperly effect the arrest of C. Philip Campbell, Esq.; failed to take appropriate remedial action when he knew that the consequences of her conduct could be avoided; and failed to make reasonable efforts to ensure that her conduct was compatible with Respondent's professional obligations. As an attorney with managerial authority, Respondent ADAMS was responsible for the conduct of Melissa Personius.

8. **Violation: Rule 4-8.4(a), (c), and (d) (Violating or Promoting Violation of Rules of Professional Conduct; Engaging in conduct involving dishonesty, fraud or deceit; Conduct in connection with the practice of law that is prejudicial to the administration of justice)**

The clear and convincing evidence is that **ROBERT D. ADAMS** conspired with Respondents DIACO and FILTHAUT, employee Melissa Personius, and Sergeant Raymond Fernandez of the Tampa Police Department to effect the arrest of C. Philip Campbell, Esq., and then covered up or otherwise destroyed evidence of his participation in that conspiracy. In addition, this conduct delayed or otherwise disrupted the ongoing litigation and required Judge Arnold to interview the jurors regarding trial publicity produced as a result of the conspiracy.

## C. Adam Robert Filthaut - No. 2013-10,737 (13F)

I recommend that the Respondent be found guilty of violating **Rule 3-4.3** of the Rules of Discipline of The Florida Bar; and **Rule 4-3.4(a); Rule 4-3.4(g); Rule 4-3.5(c);** and **Rule 4-8.4(a), (c), and (d)** of Rules of Professional Conduct.

1. **Violation: Rule 3-4.3 (Misconduct and Minor Misconduct)**

   The clear and convincing evidence is that **ADAM ROBERT FILTHAUT** conspired with Respondents DIACO and ADAMS, employee Melissa Personius, and Sergeant Raymond Fernandez of the Tampa Police Department to improperly effect the arrest of C. Philip Campbell, Esq., and then attempted to cover-up or otherwise destroy evidence of his participation in that conspiracy.

2. **Violation: Rule 4-3.4(a) (unlawfully obstruct another party's access to evidence)**

   The clear and convincing evidence is that **ADAM ROBERT FILTHAUT** destroyed and/or concealed his cell phone and/or its contents, which he knew or should have known were relevant to a pending or reasonably foreseeable proceeding.

3. **Violation: Rule 4-3.4(g) (present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter)**

   The clear and convincing evidence is that **ADAM ROBERT FILTHAUT** conspired with Respondents DIACO and ADAMS, employee Melissa Personius, and Sergeant Raymond Fernandez of the Tampa Police Department to improperly effect the arrest of C. Philip Campbell, Esq., solely to obtain an advantage in an ongoing civil litigation.

4. **Violation: Rule 4-3.5(c) (Conduct intended to disrupt a tribunal)**

   The clear and convincing evidence is that **ADAM ROBERT FILTHAUT** conspired with Respondents DIACO and ADAMS, employee Melissa Personius, and Sergeant Raymond Fernandez of the Tampa Police Department to improperly effect the arrest of C. Philip Campbell, Esq., with the intent that it disrupt an ongoing civil trial.

49

5. **Violation: Rule 4-8.4(a), (c), and (d) (Violating or Promoting Violation of Rules of Professional Conduct; Engaging in conduct involving dishonesty, fraud or deceit; Conduct in connection with the practice of law that is prejudicial to the administration of justice)**

The clear and convincing evidence is that **ADAM ROBERT FILTHAUT** conspired with Respondents DIACO and ADAMS, employee Melissa Personius, and Sergeant Raymond Fernandez of the Tampa Police Department to improperly effect the arrest of C. Philip Campbell, Esq., and then covered up or otherwise destroyed evidence of his participation in that conspiracy. Respondent FILTHAUT further engaged in dishonesty, deceit and/or misrepresentation when he failed to disclose to Sergeant Fernandez that Mr. Campbell was the opposing attorney in a high profile civil action that was then currently being defended by the Adams & Diaco law firm. In addition, this conduct delayed the ongoing litigation and required Judge Arnold to interview the jurors regarding trial publicity produced as a result of the conspiracy.

## IV.  CASE LAW

Before arriving at a recommendation as to the disciplinary measures to be applied the Referee considered the following case law:

*Florida Bar v. Cox*, 794 So. 2d 1278 (Fla. 2001); *Florida Bar v. Rotstein*, 835 So. 2d 241 (Fla. 2002); *Florida Bar v. Korones*, 752 So. 2d (Fla. 2000); *Florida Bar v. Bern*, 425 So. 2d 526 (Fla. 1982); *Florida Bar v. Swann*, 116 So. 3d 1225 (Fla. 2013); *Florida Bar v. Doherty*, 94 So. 3d 443 (Fla. 2012); *Florida Bar v. Klein*, 774 So. 2d 685 (Fla. 2000); *Florida Bar v. Gardiner*, No. SC11-2311, 2014 WL 2516419 (Fla. June 5, 2014); *Florida Bar v. Glueck*, 985 So. 2d 1052 (Fla. 2008); *Florida Bar v. St. Louis*, 967 So. 2d 108 (Fla. 2007); *Florida Bar v. Hmielewski*, 702 So. 2d 218 (Fla. 1997); *Florida Bar v. Riggs*, 944 So. 2d 167 (Fla. 2006); *Florida Bar v. Ratiner*, 46 So. 3d 35 (Fla. 2010).

50

## V. RECOMMENDATION AS TO DISCIPLINARY MEASURES TO BE APPLIED

### A. Stephen Christopher Diaco - No. 2013-10,735 (13F)

I recommend that Respondent **STEPHEN CHRISTOPHER DIACO** be found guilty of misconduct justifying disciplinary measures and that he be disciplined by:

1. Permanent Disbarment
2. Payment of The Florida Bar's costs in these proceedings

### B. Robert D. Adams - No. 2013-10,736 (13F)

I recommend that Respondent **ROBERT D. ADAMS** be found guilty of misconduct justifying disciplinary measures and that he be disciplined by:

1. Permanent Disbarment
2. Payment of The Florida Bar's costs in these proceedings

### C. Adam Robert Filthaut - No. 2013-10,737 (13F)

I recommend that Respondent **ADAM ROBERT FILTHAUT** be found guilty of misconduct justifying disciplinary measures and that he be disciplined by:

1. Permanent Disbarment
2. Payment of The Florida Bar's costs in these proceedings

## VI. PERSONAL HISTORY, PAST DISCIPLINARY RECORD, AND AGGRAVATING AND MITIGATING FACTORS

In recommending sanctions after finding misconduct, the Referee considered the following factors as to each Respondent:

51

a) the duty violated;
b) the lawyer's mental state;
c) the potential or actual injury caused by the lawyer's misconduct; and
d) the existence of aggravating or mitigating factors.

## A. Stephen Christopher Diaco - No. 2013-10,735 (13F)

Prior to recommending discipline pursuant Rule 3-7.6 (m)(1), I considered the following:

### 1. Personal History of Respondent
   a. Date of Birth - 1968
   b. Date Admitted to the Bar – April 25, 1994[3]

### 2. Duties Violated

The following Florida Standards for Imposing Lawyer Sanctions (Standards) support the sanction of disbarment:

#### a. Violations of Duties Owed to the Public

Pursuant to Section 5.11, disbarment is appropriate when:

> f) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.

#### b. Violations of Duties Owed to the Legal System

Pursuant to section 6.11, disbarment is appropriate when a lawyer:

---

[3] Subsequent to the sanctions hearing, the Referee requested biographical information from each respondent, including education and employment information. Counsel for Respondents ADAMS and FILTHAUT responded with the information. Referee received no response from counsel for Respondent DIACO, but did obtain his year of birth and date admitted to the Bar from The Florida Bar.

52

a) with the intent to deceive the court, knowingly makes a false statement or submits a false document; or
b) improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding.

### c. Violations of Other Duties Owed as a Professional

Pursuant to section 7.1, disbarment is appropriate when "a lawyer intentionally engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system."

### 3. The Potential or Actual Injury Caused By the Respondents Misconduct

a. Wrongful arrest and incarceration of C. Philip Campbell, Esq.;
b. Public humiliation of Mr. Campbell and damage to his professional reputation;
c. Disruption of ongoing jury trial and tainting of jury;
d. Discharge of Sergeant Raymond Fernandez from the Tampa Police Department;
e. Removal of Officer Tim McGinnis from DUI Squad;
f. Dismissal of significant number of pending DUI cases[4];
g. Public loss of confidence in lawyers and legal system; and
h. Public loss of confidence in law enforcement.

---

[4] Although The Florida Bar did not adduce any testimony or produce any documentation regarding the dismissals, a number of the news articles in the compilation submitted by The Bar during the penalty phase hearing contained quotations from Tampa Police officials confirming this fact.

53

## 4. The Existence of Aggravating or Mitigating Circumstances

### a. Aggravation

The Referee finds the following aggravating factors pursuant to 9.22 of Standard 9.2:

> b. Dishonest or Selfish Motive;
> d. Multiple offenses;
> f. Submission of false evidence, false statements, or other deceptive practices during the disciplinary process;
> i. Substantial experience in the practice of law.

### b. Mitigation

The Referee finds the following as to mitigating factors pursuant to 9.32 of Standard 9.3:

> a. Absence of prior disciplinary record; and
> g. Character or reputation.

### Commentary

During the two days of testimony regarding the sanctions to be recommended, there was ample testimony from multiple witnesses regarding the generosity of Respondent DIACO, his charitable efforts, public service, and loyalty to friends and employees. Virtually all of the witnesses professed to have little or no knowledge regarding the allegations of Respondent's conduct that resulted in this proceeding.

54

At the conclusion of the hearing, Respondent's counsel sought to introduce an affidavit from the Respondent, presumably expressing remorse and seeking to take responsibility for the events that led to this proceeding. The Referee refused to admit the affidavit, although counsel was allowed to proffer it for the record. It was not read or considered. Respondent DIACO, throughout this proceeding, has refused to testify under oath regarding anything connected to the events surrounding these proceedings. He may not shield himself from cross-examination by invocation of the Fifth Amendment while at the same time seeking to submit sworn statements supporting mitigation.

Respondent DIACO is an experienced, apparently competent attorney with 20 years in the profession. He and his firm have multiple offices and employ numerous associates and paralegal staff. Adams & Diaco have major clients and are, by all appearances, professionally and financially successful.

Against this backdrop, it is all the more disturbing that Respondent DIACO, one of the firm's managing partners, engaged in actions against a fellow attorney that were inexplicably egregious, spiteful, and malicious. While Mr. Campbell and his firm were reeling from the fallout of the Respondents' conspiracy, Respondent DIACO attempted to leverage the moment to his advantage by proposing to discuss settlement. There was no evidence presented at trial to support the suggestion that Mr. Campbell intended to drink and drive on the night of his arrest,

55

- 68 -

or that he had a habit of drinking and driving. The clear and convincing evidence was that Respondent DIACO's intent was to target Mr. Campbell for arrest because he was opposing counsel in a high-profile case and that it would benefit his firm and his client.

Respondent DIACO's efforts to exploit the situation did not cease until the identity of Ms. Personius was ultimately discovered. The inevitable attempted cover up followed these multiple offenses, including the bizarre travels of Mr. Campbell's trial briefcase. The cover up effort included false testimony before Judge Arnold, a false affidavit filed in *Schnitt v. Clem*, obstruction of service of process, destruction or secreting of known relevant evidence, and the deliberate failure to disclose a key witness, Kristopher Personius, during discovery in this proceeding.

If the cover up had succeeded, Mr. Campbell would have been the attorney answering charges from The Florida Bar, as well as the State of Florida. This malicious tampering with another person's personal life and career was not only unprofessional, it was inexcusable.

Respondent DIACO's many admittedly generous and unselfish acts do not atone for the multiple aggravated violations he committed. It is the Referee's recommendation that he be permanently disbarred.

## B. Robert D. Adams - No. 2013-10,736 (13F)

Prior to recommending discipline pursuant Rule 3-7.6 (m)(1), I considered the following:

**1. Personal History of Respondent Robert D Adams:**

a. Date of Birth – May 27, 1969
b. Education – University of Florida, B.A. w/Honors, 1991
   Stetson College of Law, J.D. w/Honors, 1996
c. Employment – Associate, Harris, Barrett, Mann & Dew, 1996 – 1998; Shareholder Adams & Diaco, 1998 to present.
d. Date Admitted to the Bar – September 26, 1996

**2. Duties Violated**

The following Florida Standards for Imposing Lawyer Sanctions (Standards) support the sanction of disbarment:

**a. Violations of Duties Owed to the Public**

Pursuant to section 5.11, disbarment is appropriate when:

> f) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.

**b. Violations of Duties Owed to the Legal System**

Pursuant to section 6.11, disbarment is appropriate when a lawyer:

> a) with the intent to deceive the court, knowingly makes a false statement or submits a false document; or
> b) improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding.

57

## c. Violations of Other Duties Owed as a Professional

Pursuant to section 7.1, disbarment is appropriate when "a lawyer intentionally engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system."

### 3. The Potential or Actual Injury Caused By the Respondents Misconduct
   a. Wrongful arrest and incarceration of C. Philip Campbell, Esq.
   b. Public humiliation of Mr. Campbell and damage to his professional reputation
   c. Disruption of ongoing jury trial and tainting of jury
   d. Discharge of Sergeant Raymond Fernandez from the Tampa Police Department
   e. Removal of Officer Tim McGinnis from DUI Squad
   f. Dismissal of significant number of pending DUI cases
   g. Public loss of confidence in lawyers and legal system
   h. Public loss of confidence in law enforcement

### 4. The Existence of Aggravating or Mitigating Circumstances

### a. Aggravation

The Referee finds the following aggravating factors pursuant to 9.22 of Standard 9.2:

> b. Dishonest or Selfish Motive;
> c. A pattern of misconduct;
> d. Multiple offenses;
> f. submission of false evidence, false statements, or other deceptive practices during the disciplinary process;
> i. Substantial experience in the practice of law.

58

### b. Mitigation

The Referee finds the following mitigating factors pursuant to 9.32 of Standard 9.3:

a. Absence of prior disciplinary record; and
g. Character or reputation.

### Commentary

During the hearing regarding sanctions, several witnesses testified on behalf of Respondent ADAMS. Affidavits were also introduced on his behalf. All were supportive of him as a loyal friend, a worthy mentor to young lawyers, and a generous and competent professional. The Florida Bar conceded that the Respondent had no prior disciplinary record. None of the Respondent's witnesses were aware of any specific information about the Respondent's conduct that resulted in their being called as a character witness.

The Bar did produce one witness to testify in support of an additional aggravation factor for this Respondent.

Dr. Robert Frankl, D.C. is a chiropractor from Miami Shores. During the latter part of 2009 through the first few months of 2010, Dr. Frankl was involved in litigation regarding the collection of fees against Progressive Insurance Company, represented by Respondent ADAMS. The issue in the case was the reasonableness of the doctor's fees for treatment that had been billed to Progressive.

59

Dr. Frankl testified that a few days prior to trial in the case, two young women appeared at his office for a consultation appointment. Both women gave what were later found to be false names, and when asked, each were unable to provide any identification. Both women claimed to have been injured and in need of chiropractic treatment. Each woman inquired whether Dr. Frankl would be willing to discount his normal rate since they each claimed a lack of applicable insurance coverage. He told them he would not reduce his fees, but was willing to accept payment over time. Dr. Frankl arranged an appointment for both women the following week. Neither woman appeared for their respective appointments and Dr. Frankl never heard from them again.

The week following the consultation with the two women, Dr. Frankl was surprised to see some blown up photographs of his office in the courtroom during the Progressive Insurance Company trial. He could not recall anyone coming in to take the photographs, although they seemed recent since they included a new freezer that had been purchased a few weeks before the trial. After the trial, Dr. Frankl remembered the two strange women who appeared at his office without identification. Using the phone number log on his phone from the women's initial call for an appointment and the internet, Dr. Frankl was able to locate a picture of one of the women and learn that she was a paralegal in the Miami office of Adams & Diaco. He believed that their purpose for visiting him was to lure him into

60

committing "insurance fraud" or to otherwise obtain admissions from him regarding his fee policy that might be used against him in the upcoming trial.

Dr. Frankl has a history of litigating for his fees, as he freely admitted. He also admitted that he regularly files complaints about attorneys with The Florida Bar. He did so in this instance, and got a response letter back from a Bar representative a few days later. He was advised that it was not a proper Bar matter, and that it would have to be resolved by a civil action. Dr. Frankl was not easily dissuaded. He then filed a complaint with the Division of Consumer Services of the Florida Department of Financial Services regarding the actions of Progressive Insurance Company's counsel and paralegals. In response, Dr. Frankl received a copy of a response letter from a Progressive representative that was sent to the Department responding to the complaint. The letter alleged that Respondent ADAMS did not direct his employees to *"present false information in order to secure evidence against Dr. Frankl at trial; however, it does appear that two non-attorney employees of Adams and Diaco did go to Dr. Frankl's office in order to obtain pictures of Dr. Frankl's office."*

The Division took no further action regarding Dr. Frankl's complaint. A few years later, Dr. Frankl read a newspaper account of the Campbell DUI case and recognized the Adams & Diaco law firm as the subject of one of his numerous ethics complaints. He contacted Mr. Campbell and related his experience regarding

61

Respondent ADAMS's paralegals that, he was convinced, had attempted to set him up. His story was picked up by a newspaper reporter and thereafter came to the attention of The Florida Bar in this matter.

Dr. Frankl's bias was admitted and his credibility regarding the 2010 incident would be suspect, were it not for the admission by Progressive that two Adams & Diaco employees did appear at his office as he testified. Respondent ADAMS, who testified at the guilt phase of this proceeding, offered no rebuttal to Dr. Frankl's serious accusations during the sanctions phase hearing. If, as the Progressive letter suggests, the only purpose of the two Adams & Diaco employees visit was to obtain photographs of Dr. Frankl's office interior, then there are provisions under the rules that provide for it. At the very least, the incident reflects a willingness to use surreptitious methods to accomplish goals that should have been addressed through an above-board discovery process.

This incident occurred a little over two years before the events that are the subject of this proceeding. No other evidence or testimony regarding it was produced except for copies of the correspondence from Progressive, the letter from The Florida Bar, and some copies of Dr. Frankl's internet search results. In the absence of some reasonable explanation, which was not forthcoming during the sanctions hearing, Dr. Frankl's experience with Respondent ADAM's unorthodox discovery methods cannot be ignored. His counsel in this matter has argued that

62

Respondent's actions in the events that resulted in this proceeding were "aberrant" or "atypical." Dr. Frankl's unrebutted testimony, confirmed through the correspondence, suggests otherwise. The incident displays willingness to engage in a pattern of conduct employing non-lawyer personnel to deliberately misrepresent their identity to accomplish purposes beyond normal discovery.

The Referee will not reiterate the comments regarding Respondent ADAMS that were previously set out in the narrative of the events of January 23 – 25, 2013. Respondent ADAMS' involvement in those events, as demonstrated by the cell phone call and text records, was extensive. Respondent ADAMS was the first person Ms. Personius called when she spotted Mr. Campbell at Malio's that night, and Respondent ADAMS was the last person she spoke to immediately preceding getting into her car with Mr. Campbell, less than ten minutes before his arrest. She received a text from Respondent ADAMS less than seven minutes before his arrest and sent a text back to Respondent ADAMS two minutes later.

Respondent ADAMS, like his co-Respondents, is an experienced, competent attorney and litigator. His counsel has argued that Respondent suffered a 3-½ hour "lapse in judgment" and that his "mistakes were spontaneous" and "unplanned." The record reflects otherwise. The evidence was clear and convincing that Respondent ADAM's participation in the effort to effect the arrest of Mr. Campbell was calculated and had no other purpose than to gain some advantage in

63

the ongoing *Schnitt v. Clem* jury trial. Respondent ADAMS had weeks to contemplate the failed attempt to arrest Mr. Campbell on November 29, 2012, and the legal, ethical, and moral implications of that attempt. He had weeks to discuss that effort with the co-Respondents and to exercise his experienced judgment regarding the propriety and advisability of any similar future efforts. When the next opportunity arrived, he didn't caution, he didn't object, he didn't "mentor," and he didn't hesitate.

The next day, Respondent ADAMS was again the first person Ms. Personius called when she discovered Mr. Campbell's trial briefcase in her car. Respondent claimed he was "too busy" to deal with it. When the opportunity came to again exercise some ethical and moral judgment, he declined and passed it off to Respondent DIACO.

The cover up followed. He erased his cell phone text messages and for months refused to testify under oath regarding the events. He too failed to list Kristopher Personius as a person with knowledge of the events of that night in response to The Florida Bar's interrogatories. On the morning of trial, he claimed to have finally realized that his license to practice law might be in jeopardy and chose to testify.

The Referee recommends that Respondent ADAMS be permanently disbarred.

64

## C. Adam Robert Filthaut - No. 2013-10,737 (13F)

Prior to recommending discipline pursuant Rule 3-7.6 (m)(1), I considered the following:

### 1. Personal History of Respondent Adam Robert Filthaut

a. Date of Birth – June 16, 1974
b. Education – University of Detroit, B.S., 1996
   Thomas M. Cooley Law School, J.D., 2000
c. Employment – Hillsborough County Public Defender's Office, 2001 – 2003; Adams & Diaco, P.A., 2003 to present.
d. Date Admitted to the Bar – September 14, 2000

### 2. Duties Violated

The following Florida Standards for Imposing Lawyer Sanctions (Standards) support the sanction of disbarment:

#### a. Violations of Duties Owed to the Public

Pursuant to section 5.11, disbarment is appropriate when:

> f) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.

#### b. Violations of Duties Owed to the Legal System

Pursuant to section 6.11, disbarment is appropriate when a lawyer:

> a) with the intent to deceive the court, knowingly makes a false statement or submits a false document; or
> b) improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding.

65

### c. Violations of Other Duties Owed as a Professional

Pursuant to section 7.1, disbarment is appropriate when "a lawyer intentionally engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system."

## 3. The Potential or Actual Injury Caused By the Respondents Misconduct

a. Wrongful arrest and incarceration of C. Philip Campbell, Esq.
b. Public humiliation of Mr. Campbell and damage to his professional reputation
c. Disruption of ongoing jury trial and tainting of jury
d. Discharge of Sergeant Raymond Fernandez from the Tampa Police Department
e. Removal of Officer Tim McGinnis from DUI Squad
f. Dismissal of significant number of pending DUI cases
g. Public loss of confidence in lawyers and legal system
h. Public loss of confidence in law enforcement

## 4. The Existence of Aggravating or Mitigating Circumstances

### a. Aggravation

The Referee finds the following aggravating factors pursuant to section 9.22 of Standard 9.2:

b. Dishonest or Selfish Motive;
c. A pattern of misconduct;
d. Multiple offenses;
f. Submission of false evidence, false statements, or other deceptive practices during the disciplinary process;
i. Substantial experience in the practice of law.

66

## b. Mitigation

The Referee finds the following as to mitigating factors pursuant to section 9.32 of Standard 9.3:

a. Absence of prior disciplinary record; and
g. Character or reputation.

<u>Commentary</u>

Several witnesses testified on behalf of Respondent FILTHAUT during the sanctions hearing. He was described as a competent professional and a loyal friend. Respondent has no prior disciplinary record and his character and reputation were considered excellent.

Respondent's counsel, in his written argument following the hearing on penalties, argues a number of mitigation factors, but the Referee may not find that they exist based only upon counsel's argument.

The record does not support the remaining mitigating factors urged by Respondent's counsel. There was nothing to suggest the absence of a dishonest or selfish motive. There was no evidence of personal or emotional problems. Negotiating with The Florida Bar for an agreed-upon sanction did not constitute a display of a cooperative attitude toward these proceedings, especially in light of the Respondent's refusal to testify and his failure to retain or produce his cell phone text messages. He certainly has a right to rely on the Fifth Amendment, but doing so did not amount to cooperation. Likewise, the failure to disclose Kristopher

67

Personius as a person with knowledge of the events that led to these proceedings in response to The Florida Bar interrogatory certainly constitutes the opposite of cooperation.

As the Referee previously indicated in the narrative of the events of January 23 – 25, 2013, the entire two-month effort to accomplish the arrest of C. Philip Campbell, Jr., Esq. was dependent upon the unique relationship of trust and friendship that Respondent FILTHAUT enjoyed with Sergeant Raymond Fernandez. Without Respondent FILTHAUT's participation, which is amply confirmed by the record, the plot had virtually no chance of success. His relationship with Sergeant Fernandez gave him instant access to the efforts of the entire Tampa Police Department DUI Squad. Respondent FILTHAUT acted as the conduit for Sergeant Fernandez regarding the updating of events happening inside Malio's. Respondent FILTHAUT, through his communication with Ms. Personius, became the eyes and ears of the Tampa DUI Squad. He kept the officers immediately informed of what was happening inside Malio's, when Mr. Campbell was leaving, where he was before he left, and what kind of car he would be driving. For over 3 ½ hours, Respondent FILTHAUT essentially presided over a police stakeout of his own creation that was totally dependent upon the information he provided them. That information did not include the fact that Mr. Campbell was an opposing attorney in the *Schnitt v. Clem* case, or that an Adams & Diaco

68

paralegal, operating under a false identity, was buying him drinks and getting him to drive when he otherwise would not have.

Respondent's willingness to betray a 15-year friendship and sacrifice the career and personal freedom of a fellow attorney for the sake of some potential advantage in an ongoing trial remains stunning. Yet the clear and convincing evidence leaves no doubt that Mr. Campbell was deliberately targeted solely to gain that advantage.

Respondent FILTHAUT also had many weeks to contemplate the professional and ethical propriety of his actions following his first attempt to have Mr. Campbell arrested on November 29, 2012. He was an experienced lawyer with 13 years in the practice. During any stage of the 3 ½ hours that the Respondents remained engaged in the effort to improperly effect Mr. Campbell's arrest, any one of them, including particularly Respondent FILTHAUT, could have called a halt to it.

As was previously suggested in the narrative, following orders is not a legal or ethical basis for avoiding personal and professional responsibility for the many serious violations that the Referee found by clear and convincing evidence were committed.

The Referee recommends that Respondent FILTHAUT be permanently disbarred.

69

## VII. STATEMENT OF COSTS AND MANNER IN WHICH COSTS SHOULD BE TAXED

### A. Stephen Christopher Diaco - No. 2013-10,735 (13F)

The following costs regarding Respondent DIACO were submitted to the Court in the form of an Affidavit by The Florida Bar and the Respondent has not objected:

1. Administrative costs (Rule 3-7.6(q)(1)(I)) .........$1,250.00
2. Court Reporter's Fees .......................................$9,108.18
3. Bar Counsel Expenses......................................$620.27
4. Investigative Costs...........................................$819.47
5. Copy Costs......................................................$1,350.75
6. Witness Expenses.............................................$1,029.61

        Total .......................................$14,178.28

It is recommended that such costs be charged to the Respondent and that interest at the statutory rate shall accrue and be payable beginning 30 days after the judgment has become final unless a waiver is granted by the Board of Governors of The Florida Bar.

### B. Robert D. Adams - No. 2013-10,736 (13F)

The following costs regarding were submitted to the Court in the form of an Affidavit by The Florida Bar and the Respondent has not objected:

1. Administrative costs (Rule 3-7.6(q)(1)(I)) .........$1,250.00
2. Court Reporter's Fees .......................................$9,488.56

3. Bar Counsel Expenses..............................$620.27

4. Investigative Costs................................$819.47

5. Copy Costs.......................................$1,350.75

6. Witness Expenses................................$1,029.61

     Total ...............................$14,558.66

It is recommended that such costs be charged to the Respondent and that interest at the statutory rate shall accrue and be payable beginning 30 days after the judgment has become final unless a waiver is granted by the Board of Governors of The Florida Bar.

## C. Adam Robert Filthaut - No. 2013-10,737 (13F)

The following costs regarding Respondent FILTHAUT were submitted to the Court in the form of an Affidavit by The Florida Bar and the Respondent has not objected:

1. Administrative costs (Rule 3-7.6(q)(1)(I)) .........$1,250.00

2. Court Reporter's Fees .........................$9,108.18

3. Bar Counsel Expenses..........................$620.27

4. Investigative Costs.............................$819.47

5. Copy Costs.....................................$1,350.75

6. Witness Expenses..............................$1,029.61

     Total ......................................$14,178.28

71

It is recommended that such costs be charged to the Respondent and that interest at the statutory rate shall accrue and be payable beginning 30 days after the judgment has become final unless a waiver is granted by the Board of Governors of The Florida Bar.

/s/ W. Douglas Baird
Honorable W. Douglas Baird, Referee

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the original of the foregoing Report of Referee has been sent by U.S. Mail to THE HONORABLE JOHN A. TOMASINO, Clerk, Supreme Court of Florida, 500 South Duval Street, Tallahassee, Florida 32399; and sent by email to: THE HONORABLE JOHN A. TOMASINO, Clerk, Supreme Court of Florida, e-file@flcourts.org; Gregory W. Kehoe, Esq., kehoeg@gtlaw.com, attorney for Respondent Diaco; Joseph A. Corsmeier, Esq., jcorsmeier@jac-law.com, attorney for Respondent Diaco; Mark J. O'Brien, Esq., mjo@markjobrien.com, attorney for Respondent Filthaut; William F. Jung, Esq., wjung@jungandsisco.com, attorney for Respondent Adams; and Jodi Anderson Thompson, Esq., JThompso@flabar.org, Bar Counsel, The Florida Bar, this 27th day of August, 2015.

/s/ W. Douglas Baird
Honorable W. Douglas Baird, Referee

72